1

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NEW YORK

3   _____

4   WILLIAM J. WAGNER,

5          Plaintiff,

6          vs              Docket No. 15-CV-633-JTC

7

8   CHIARI & ILECKI, LLP,

9          Defendant.

     _____

10

11  Examination Before Trial of WILLIAM ILECKI, ESQ., held

12  pursuant to the Federal Rules of Civil Procedure, in

13  the law offices of CONNORS LLP, 1000 Liberty Building,

14  424 Main Street, Buffalo, New York, on Wednesday,

15  October 5, 2016 at 10:08 a.m. before Molly Fenske,

16  Notary Public.

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

     LAW OFFICES OF KENNETH HILLER, PLLC
 3   BY:   SETH J. ANDREWS, ESQ.
     6000 North Bailey Avenue, Suite 1A
 4   Amherst, New York  14226
     sandrews@kennethhiller.com
 5   Appearing for the Plaintiff.

 6

     CONNORS LLP
 7   BY:   PAUL A. WOODARD, ESQ.
     1000 Liberty Building
 8   424 Main Street
     Buffalo, New York  14202
 9   paw@connorsllp.com
     Appearing for the Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX TO WITNESS

2

3   WILLIAM ILECKI, ESQ.                          PAGE

4

5   Examination by Mr. Andrews....................6

6

7

8

9                    INDEX TO EXHIBITS

10

11  EXHIBIT                                        PAGE

12

13  Exhibit Plaintiff's A, events sheet...........18

14  Exhibit Plaintiff's B, E-mail.................49

15  Exhibit Plaintiff's C, Real Info print-out.....57

16  Exhibit Plaintiff's D, Trans Union report......61

17             Exhibits retained by counsel.

18

19

20

21

22

23

24

25

```
 1                    (Whereupon, the following stipulations
 2      were entered into by the respective parties:
 3                    It is hereby stipulated by and between
 4      counsel for the respective parties that the oath of
 5      the referee is waived, that filing and certification
 6      of the transcript are waived, and all objections,
 7      except as to the form of the question, are reserved
 8      until the time of trial.)
 9                    THE REPORTER:  Mr. Andrews, you'll supply
10      Mr. Woodard?
11                    MR. ANDREWS:  Yes.
12                    THE REPORTER:  Usual stipulations or read
13      and sign?
14                    THE WITNESS:  Usual stipulations are fine
15      with me because it allows me the opportunity to review
16      it.
17                    MR. WOODARD:  Yeah, perfect.
18                    (A recess was taken.)
19                    THE REPORTER:  Would you like sixty days?
20                    MR. WOODARD:  That would be great.  Is
21      that okay?
22                    THE WITNESS:  Yeah.
23                    WILLIAM ILECKI, ESQ., 371 Starin Avenue,
24      Buffalo, New York 14216, having been duly called and
25      sworn, was examined and testified as follows:
```

1           MR. ANDREWS:  Mr. Ilecki, my name is Seth

2    Andrews.  I'm the attorney for the plaintiff, William

3    J. Wagner, in this matter.  Mr. Wagner filed a lawsuit

4    in the Western District of New York naming Chiari and

5    Ilecki as a defendant alleging violations of the Fair

6    Debt Collection Practices Act.

7           You've been designated as the 30(b)(6)

8    witness for today's deposition.  I will be asking you

9    questions in that capacity.  You've also been noticed

10   as a 30(b)(1) witness.  I'll be sure to indicate if my

11   question pertains to you.  Otherwise, you should

12   assume that it's the 30(b)(6) as you're testifying; is

13   that understood?

14          THE WITNESS:  I understand, so you're

15   telling me you will reference specifically if I'm to

16   answer as an individual witness?

17          MR. ANDREWS:  Correct.  Otherwise, assume

18   the question is posed --

19          THE WITNESS:  I understand.

20          MR. ANDREWS:  Before we begin, I'm sure as

21   an attorney you know this, but I just want to cover

22   some ground rules.

23          I'm going to ask you some questions.  Do

24   your best to provide me with responses.

25          Please try to wait until I finish before

1  different -- I've had since -- since graduating from

2  law school, I've had --

3     Q.  Your firm, your current firm went through three

4  different name transitions?

5     A.  Okay.  The firm was initially Horwitz and

6  Frankel.  The next -- and that's F-R-A-N-K-E-L, and

7  Horwitz is H-O-R-W-I-T-Z; changed the name to Horwitz,

8  Frankel and Ilecki; then Horwitz and Ilecki; and then

9  we merged in 2006 to become Bulan, B as in Brian,

10  U-L-A-N as in Nancy, Chiari, Horwitz and Ilecki; and

11  then we shortened the name in 2010 to Chiari & Ilecki.

12     Q.  Starting when it was first Horwitz to the

13  present, Chiari & Ilecki, how long has your tenure

14  been with the firm?

15     A.  I believe twenty-six years, twenty-five, maybe

16  a little less than twenty-five years or twenty-six --

17  maybe a little less than twenty-six years, more than

18  twenty-five years.

19     Q.  And during that time, this is now a question

20  for you as a (b)(1) witness, does your practice -- did

21  your practice from beginning to end involve the

22  collection of debts?

23     A.  Yes.

24     Q.  Does Chiari & Ilecki handle any other type of

25  matters besides debt collection?

1     A.   Yes.

2     Q.   What other matters, generally speaking?

3     A.   Landlord-tenant, some minor estate and real

4  estate.

5     Q.   The vast majority is debt collection though?

6     A.   The majority is debt collection, yes.

7     Q.   And approximately how many employees are there

8  at Chiari & Ilecki?

9     A.   Thirteen.

10    Q.   How many attorneys are there at Chiari &

11 Ilecki?

12    A.   There are five attorneys in the firm.  We have

13 two attorneys that we have in an of counsel position.

14    Q.   Do those two of counsel count for the thirteen?

15    A.   No, they're not employees.  They don't count as

16 the five either.

17    Q.   So eight non-attorney employees?

18    A.   No, you asked how many attorneys.  There are

19 two partners, three attorneys.

20    Q.   And then my next question is how many if -- you

21 said thirteen; right?  So eight non-attorney

22 employees?

23    A.   That would be ten.  The partners aren't

24 employees.

25    Q.   You work for a living.

1          There are two paralegals that I have trained to

2     skip trace.  They do very little of it, but they have

3     been starting to review our records for skip tracing

4     purposes.

5        Q.  Did either of those individuals have any skip

6     tracing activity done on Mr. Wagner's file?

7        A.  No.

8        Q.  This is a document that was produced by the

9     defendant in response to plaintiff's discovery

10    demands.  It's bates labeled Chiari 164, 165 and 166.

11    Do you see that?

12       A.  I see 164.  I see 165 and I see 166, yes.

13       Q.  Can you explain to me what this is?

14             MR. WOODARD:  Are we marking this or no?

15             MR. ANDREWS:  No, not yet.

16             THE WITNESS:  This document is a print-out

17    of an Excel spreadsheet that details the -- we call

18    them events, things that happen on a file that are

19    noted on our Microsoft Access database program.  It's

20    a proprietary program, and this document relates to

21    the events on the William J. Wagner, Junior file that

22    we have where our client is MJ Peterson, LLC.

23             (Whereupon, Exhibit Plaintiff's A, an

24    events sheet, was marked for identification.)

25    BY MR. ANDREWS:

```
 1              THE WITNESS:  Actually, that is -- when
 2     you say predecessor, we just simply changed the name.
 3     BY MR. ANDREWS:
 4        Q.  All right, so it's the same entity?
 5        A.  It's the same entity.
 6        Q.  This William J. Wagner file was received by the
 7     firm, and at that time, there wasn't any case
 8     management system in place?
 9              MR. WOODARD:  Object to form.
10              THE WITNESS:  Yeah, I can -- there was no
11     case management system, computerized case management
12     system employed by Goldstein, Bulan and Chiari.
13     Goldstein, Bulan and Chiari filed the lawsuit and took
14     the judgment.  So the judgment was in place by
15     Goldstein, Bulan and Chiari, and they either submitted
16     the judgment before the merger or actually obtained
17     the judgment before the merger, so nothing would have
18     been done by that 2006 merged firm.  Nothing would
19     have been done to obtain the judgment.
20     BY MR. ANDREWS:
21        Q.  So my -- I guess what I'm trying to get at is
22     this is the only record you have of activity done on
23     the account.  Anything prior, there was no -- there's
24     no case management tracking of it; correct?
25        A.  Okay.  There are copies.  There are copies of
```

1  documents, but there's no case management system,

2  whether it be computerized or written, where an

3  attorney would actually write notes of everything that

4  happened.

5      Q.  So when you previously testified that the

6  address 378 Windermere Boulevard was determined to be

7  the address through a Lexis search, is that from

8  memory?  Because there's no record of that as far as

9  an activity log because there was no case management

10  system at the time; correct?

11      A.  Again, I'm going to object to the form myself

12  because there's a lot in that question.  Before a file

13  is placed on our computer database, I review the file.

14  I review the Lexis program.  Today, it's a Westlaw

15  program.  We also have a Lexis program.  We actually

16  have both, but it's accurate today.  There's no more

17  SmartLinx, so I review those websites.  That review is

18  done before a file is placed on our computer system,

19  so you will never see a notation before a file is open

20  that a review is made.  It's just done.

21      Q.  And you know that because you're the only one

22  that does it?

23      A.  I'm not the only one that does it.  My

24  paralegal today is reviewing new files and then I

25  review after her.  I have had attorneys also review

1   files, attorneys I'm training for example.  All new

2   attorneys that start, I have them review Westlaw and

3   Lexis.  For the new attorneys, I then review what

4   they've looked at.  They will -- it's part of the

5   training.  So back in 2006, other than me, I don't

6   know who else at that time would have also reviewed

7   the file before the conversion.

8       Q.  Okay.  So is there a procedure in place then --

9   after that initial Lexis search was done, is there a

10  procedure in place to determine a proper address upon

11  being notified that the address you thought was good

12  based on your Lexis search, which turns out isn't, is

13  there a procedure that would help you identify a good

14  address?

15      A.  Correct.

16          MR. WOODARD:  I'm just going to object to

17  I guess asking to some extent this line of questioning

18  and asking him about procedures in place at a time

19  that's not really relevant to the lawsuit.  I'll give

20  you some leeway, but I just do want to note the

21  objection.

22          THE WITNESS:  And I appreciate it.  There

23  have been procedures in place.  To determine a correct

24  address, you have to be notified of an incorrect

25  address my entire practice, so that's a fact.

1             Now, I do want to say that we also run

2     credit reports.  I cannot tell here when we ran a

3     credit report first because I don't remember when we

4     started including the requests for a credit report in

5     the events.  The credit report used to be requested

6     without an event being created.  So in addition to a

7     Lexis or Westlaw search, there is a review of credit

8     reports done on every file at some point where we have

9     a judgment just about, unless it's paid or a

10    bankruptcy is filed.

11    BY MR. ANDREWS:

12      Q.   If we go back to 164, and if we look at May 10,

13    2011 for the event date?  Are you with me?

14      A.   Yep.

15      Q.   And it looks like it says previous address,

16    1571 Eggert Road, Wagner, William J.?

17      A.   Okay.

18      Q.   How did you determine if 1571 Eggert Road was a

19    possible address?

20      A.   Well, I again would not have been the one who

21    would have reviewed this, but you can see prior to the

22    May 10, 2011 events, you will see the attorneys who

23    reviewed the file for actually over two years, over a

24    two-year period.  So I -- so they would have been the

25    ones who determined a new address, and they would have

1    determined a new address reviewing credit reports and

2    Lexis primarily.  Of course, they could have also

3    determined new address in this case from a PO.  It

4    looks like a PO box letter that may have gone out or a

5    judgment letter may have gone out because you look at

6    the event on April 7, 2011, letter, post office

7    address request, that is a letter to the post office

8    requesting a new address.

9        Q.  And presumably then the post office provided

10   1571 Eggert Road?

11               MR. WOODARD:  Form.

12               THE WITNESS:  Well, we have on April 14,

13   2011, actually, I don't have -- other than the April

14   14, 2011, you'll see the USPS PO box letter returned.

15   It looks like no change of address that you would see

16   on April 14, 2011.

17   BY MR. ANDREWS:

18       Q.  So at this point, we're in 2011.  The file was

19   opened sometime prior to September of 2006; is that

20   correct?

21       A.  Again, the file would have been opened by

22   Goldstein, Bulan and Chiari before September 2006.

23       Q.  So we're five years in, and has there been any

24   contact with the debtor at this point that you can see

25   from this event log?

1    A.  Well, there would have been contact with the

2  debtor by the prior firm.

3    Q.  How do you know that?

4    A.  They served the debtor.

5    Q.  Was he personally served?

6    A.  I don't know how he was served, but he was

7  served.

8    Q.  Do you know if it was a default judgment

9  entered?

10    A.  I do not know, but I do not know off the top of

11  my head, but it would be in the documentation.

12    Q.  After entry of the judgment, do you know if

13  there was any contact between September '06 and May of

14  2011 with the debtor?

15    A.  From September 2006?

16    Q.  To May of 2011, which...

17    A.  There was contact.

18    Q.  What contact?

19    A.  There was a letter sent to the debtor on

20  January 13, 2007.

21    Q.  For a contempt motion?

22    A.  No.

23    Q.  I apologize.  I see, yep.  That's the letter

24  informing that Chiari & Ilecki is now handling the

25  matter?

1    A.   It is a letter informing the debtor of the new

2   -- of the merged firm handling the matter, providing

3   that letter also includes the CPLR 5222, notice of

4   judgment debtor.  It would have included a copy of the

5   judgment as well.

6    Q.   And that was sent certified, the debtor signed

7   for that letter?

8    A.   No.

9    Q.   So you don't know whether he received the

10  letter then?

11   A.   Well, the letter was mailed to the debtor.

12   Q.   I know, but what I'm trying to ask is you can

13  mail a letter, but maybe that's not the correct

14  address.  Do you have any knowledge that he received

15  that letter?  It wasn't sent certified.  He didn't

16  sign for it; correct?

17   A.   There is a presumption of mailing, so I have

18  that knowledge.

19   Q.   If that address happens to be the correct

20  address?

21   A.   What do you mean by correct address?  I need to

22  clarify that.

23   Q.   Well, you can mail something and there's a

24  presumption that whoever it's addressed to receives

25  it, but if they're not living at that address, they

1   don't reside at that address, then they wouldn't

2   receive it; correct?

3                   MR. WOODARD:  Form.

4                   THE WITNESS:  That's incorrect.

5                   MR. ANDREWS:  So you can mail something to

6   someone -- your testimony today is you can mail some

7   -- mail correspondence to an address, and regardless

8   of that -- whether or not in reality the person

9   resides at that address, they're deemed to have

10  received that?

11                  MR. WOODARD:  Form.

12                  THE WITNESS:  That's a different question.

13  BY MR. ANDREWS:

14      Q.  I want to know what proof you have that the

15  debtor received that letter in January of 2007.

16      A.  One of the methods of proof we have is the

17  letter was mailed and not returned.

18      Q.  What -- you said one of them, what other...

19      A.  The presumption of mailing.

20      Q.  Is it possible that the letter was sent to that

21  address and someone else lived there and just simply

22  threw it away?

23      A.  If you're asking me a hypothetical, that is

24  always a possibility in every single piece of mail

25  that's ever mailed.

1    Q.  What I'm -- just to clarify, the debtor never

2  called into the office stating he received this letter

3  in January of 2007; correct?

4    A.  In January of 2007, we have -- we received no

5  telephone calls from the judgment debtor.

6    Q.  The debtor never sent any correspondence saying

7  he received a letter on January 13, 2007, never sent

8  you a letter back saying I got --

9    A.  That is correct.  In January 2007, there's no

10  correspondence from the debtor.

11    Q.  You never received any slip from the post

12  office, again, saying that he signed for this letter,

13  receipt of this letter?

14    A.  We would not have received a slip from the post

15  office.

16    Q.  But you didn't send it certified; correct?

17    A.  We did not send the letter certified.

18    Q.  All right.  So let's look again at May 10,

19  2011, and you send a letter to 1571 Eggert Road, as

20  well as an information subpoena to that address; is

21  that correct?

22    A.  No, that would not be correct.

23    Q.  I see May 10, 2011, document, letter to debtor.

24  What address?  What address was that letter sent to?

25    A.  I don't know from this computer print-out what

1    address that notice would have been sent to.  I might

2    be able to determine that address however, either

3    looking at the document or seeing if there was another

4    address.  If I had to guess, I would say we sent the

5    letter and the information subpoena to 102 Reiman

6    Street.

7        Q.  At one point though -- well, I'm showing you a

8    document that's been produced in response to

9    plaintiff's request for discovery to the defendant.

10   It's labeled Chiari 132.  It's an April 4, 2011 letter

11   addressed to William J. Wagner, Junior at 1571 Eggert

12   Road, Amherst, New York 14226.  So any indication that

13   the debtor received this letter other than the

14   presumption of mailing?

15       A.  There is no indication that the defendant

16   received this letter.  I mean, he didn't get the

17   letter.

18       Q.  Okay.

19       A.  There's an indication he did not.

20       Q.  And so then next you send this letter, May 10,

21   2011; is that right?  And that's the next letter that

22   would have went?

23       A.  Correct.

24            MR. WOODARD:  Chiari 138.

25   BY MR. ANDREWS:

1     Q.   Yeah, Chiari 138.

2     A.   Correct, Chiari 138 is a letter sent to the

3  judgment debtor on May 10, 2011.

4     Q.   Any indication that he received this letter?

5     A.   Yes.

6     Q.   And how do you know that?

7     A.   The letter was not returned by the post office

8  and the presumption of mailing.

9     Q.   Okay.  Outside of those two, again, the William

10 J. Wagner, Junior never called in; correct?  After

11 sending out this letter?

12    A.   Well, I have to look at the rest of the events

13 to see if he ever called in.  If you're asking if he

14 called in within a month of the letter, it does not

15 appear that we had contact from the judgment debtor in

16 response to this letter.

17    Q.   Did he ever send any -- can you tell if he ever

18 sent any correspondence in response to this letter?

19    A.   Again, it appears that there was no

20 correspondence from the defendant -- from the judgment

21 debtor within a reasonable time after this letter.

22    Q.   And was that information subpoena, was that

23 returned?

24    A.   Which information subpoena?

25    Q.   The information subpoena sent to 102 Reiman

 1   Street, floor two?

 2            MR. WOODARD:  What's the date on this?

 3            THE WITNESS:  Yeah, if you're -- there's

 4   an event where an information subpoena was sent on May

 5   10th or at least created on May 10, 2011.

 6   BY MR. ANDREWS:

 7     Q.  Same date as this letter; correct?  Chiari 138?

 8     A.  Correct, the two would have been created at the

 9   same time.

10     Q.  And sent out together?

11     A.  No, not in the same -- no, not sent out

12   together.  So just to, again, to speed things up, it

13   appears that the information subpoena was returned to

14   my office on June 8, 2011 by the USPS unclaimed.

15     Q.  And then in response, you served a subpoena or

16   attempted to serve a subpoena on the debtor?

17     A.  Well, in response, it's not a response to the

18   post --

19     Q.  June 27, 2011, the letter to server to serve?

20     A.  What we did after receiving the unclaimed

21   envelope from the postal service, we issued a subpoena

22   to take depositions, subpoena duces tecum, and --

23     Q.  The debtor exam.

24     A.  And we sent that subpoena duces tecum out to a

25   process server by letter dated June 27, 2011.

 1    Q.  And did that process server indicate that

 2  service was successful?

 3    A.  On -- no.

 4    Q.  What did he indicate?

 5    A.  Well, I'm looking at an entry from July 10,

 6  2011 where the process server stated that the

 7  defendant moved from the address at 102 Reiman Street,

 8  floor two.  Well, it doesn't say he moved from 102

 9  Reiman Street, floor two, but the address where we

10  sent the subpoena to, the debtor had moved out.

11    Q.  Just handed you a document that's bates Chiari

12  156.  Is that the affidavit that you were just

13  referring to?

14    A.  This is the affidavit of the process server

15  indicating that the judgment debtor had moved from 102

16  Reiman Street, floor two, and that the process server

17  was unable to serve the subpoena duces tecum.

18    Q.  So and the judgment was in May of '06?

19    A.  I don't know when the judgment was entered.  I

20  have no reason to doubt that, but I don't know when it

21  was entered.

22    Q.  Let's just make sure we've got the right --

23  yeah, May of '06.  Okay, so May of '06 judgment is

24  taken and now we're at July?

25    A.  Again, I just want to clarify.  I'm not saying

1  the judgment was entered in May of '06.  I'll accept

2  what you're saying for the purposes of this

3  deposition.  The judgment was entered I'm sure

4  sometime before we obtained the file.

5      Q.  I'm happy to show you, but if you want to, you

6  know, if you're going to accept --

7      A.  I don't know the relevance, but I'm saying I

8  can't just simply accept what you're telling me.  I

9  will accept for the purposes of the deposition that it

10 was May of '06 when the judgment was entered.

11     Q.  And now we're at July of 2011, and has there

12 been any monies collected on this account?

13     A.  Again, I don't know what would have been

14 collected prior to September 12, 2006.

15     Q.  From September of -- so September of '06 to...

16     A.  September 12th of 2006.

17     Q.  To July of 2011, any monies collected on the

18 account to date between that time period?

19     A.  No.

20     Q.  So it's fair to say you had a tough time

21 locating this guy?

22     A.  That is fair to say, correct.

23     Q.  Is it defendant's position as we sit here today

24 that my client, William J. Wagner, is the debtor?

25     A.  I don't know, can't answer that.

1    Q.  So you can't speak one way or another whether

2  my client, Mr. Wagner, owes the debt to MJ Peterson

3  that you're trying to collect?

4    A.  As I've answered, I cannot answer whether the

5  plaintiff is the judgment debtor in the action MJ

6  Peterson, LLC versus William J. Wagner, Junior.

7    Q.  Showing you a document that was previously

8  marked as an exhibit in plaintiff's deposition?

9    A.  It's Exhibit H.

10          MR. WOODARD:  Exhibit H from the

11  plaintiff's deposition, right, correct.

12  BY MR. ANDREWS:

13    Q.  Yeah, have you ever seen that document before

14  in preparation --

15    A.  I probably have seen the document before, but I

16  don't remember.

17    Q.  You didn't review it in preparation for today's

18  deposition?

19    A.  I did not review this document in preparation

20  for today's deposition.

21    Q.  Is that a transcript of a judgment?

22    A.  It appears to be a transcript of a judgment

23  issued from the city court of Buffalo.

24    Q.  And who is the judgment debtor?

25    A.  The judgment debtor is William J. Wagner,

1   Junior.

2       Q.  And what's the address?

3       A.  378 Windermere Boulevard, Amherst, New York

4   14226.

5       Q.  Thank you.  So I'm going to ask you again, as

6   we sit here today, my client, William J. Wagner, who

7   never resided at 378 Windermere Boulevard, is he the

8   judgment debtor?

9               MR. WOODARD:  Form.

10              THE WITNESS:  I don't know where your

11  client resided, so my answer is going to be I don't

12  know.  It's the third time I've been asked.

13              MR. ANDREWS:  Don't you think it's

14  important to be able to identify who the proper debtor

15  is?

16              MR. WOODARD:  Form.

17              THE WITNESS:  You're arguing.

18              MR. WOODARD:  Form.

19  BY MR. ANDREWS:

20      Q.  I'm just saying as a policy of Chiari & Ilecki,

21  is it important to be able to identify?

22      A.  Who the judgment debtor is?

23      Q.  Yes.

24      A.  Yes.

25      Q.  And in this case, you can't make that

1   determination; is that correct?

2                  MR. WOODARD:  Form.

3                  THE WITNESS:  I don't have a policy of

4   identifying people that sue me.

5   BY MR. ANDREWS:

6       Q.  That's not what I asked.

7       A.  Yes, it is what you asked.

8       Q.  Your office was retained by MJ Peterson to

9   collect a judgment against William J. Wagner, Junior;

10  correct?

11      A.  Goldstein, Bulan and Chiari was initially

12  retained and then they merged into Bulan, Chiari,

13  Horwitz and Ilecki.

14      Q.  Your office is handling the account; correct?

15      A.  Correct.

16      Q.  And is it important to be able to identify the

17  debtor and/or to satisfy that judgment?

18      A.  Yes, I've already answered that.

19      Q.  Okay.  Is there a procedure in place for

20  accounts with judgments to be able to collect on these

21  accounts?

22      A.  Yes.

23      Q.  What's that procedure?

24                  MR. WOODARD:  Form.

25                  THE WITNESS:  The procedure -- the

1  question I think is so overbroad I can't answer it.

2  BY MR. ANDREWS:

3      Q.  All right.  We're going to go step by step.  I

4  come to you.  I'm a client.  I've got a judgment I

5  want you to satisfy.  What's the first step?  I say

6  Bill, I need your help satisfying this judgment.

7      A.  The first step is to obtain information as to

8  the court, obtain copies of the judgment, obtain

9  identifying characteristics of the judgment debtor,

10  work out a fee agreement, explain the terms of any

11  reimbursement for disbursement, and I will tell you

12  what you're asking involves quite a bit of detail.  So

13  I may forget some steps, but you also have to ensure

14  that your client's legitimate, and if you work out

15  those issues, then a search is done as to the judgment

16  debtor.

17      Q.  Okay.  That's -- let's go from there.

18      A.  And again, it was a relatively open-ended

19  issue, but the search involves a review of whether it

20  be Lexis or Westlaw, which has information as to

21  addresses and some asset information.  It may require

22  also a review of other court documents or clerk's

23  office documents.  Usually, Westlaw or Lexis will give

24  me clues as to additional searches that would have to

25  be done.  If I choose to take on the case and I tell

1   you send that to confirm the address of the debtor?

2      A.   Primarily.

3      Q.   Primarily to confirm --

4      A.   Actually, I didn't state that because if I'm

5   intending on serving a restraining notice I have to

6   send a 5222 notice, so there are many reasons why I

7   would send this letter.  One of the reasons would be

8   to confirm an address.  If I have nothing else that

9   I'm doing on the account, this letter would often go

10  out to confirm an address.

11     Q.   And if it doesn't come back as undelivered,

12  then Chiari & Ilecki's policy is that's a good

13  address?

14                MR. WOODARD:  Form.

15                THE WITNESS:  I wouldn't say it's Chiari

16  and Ilecki's policy that it's a good address.  Based

17  on the Lexis search or credit report search, we

18  probably have a good reason to believe it's a good

19  address, and I would say in most cases I would believe

20  it's a good address, but I won't always be certain

21  it's a good address.  I'd have to look at each file.

22  If you're asking generally, I could say generally I

23  would presume it's a good address, but not always.

24  BY MR. ANDREWS:

25     Q.   Looking at that document, the February 2, 2015

1  letter, it's addressed to William J. Wagner, Junior;

2  correct?

3     A.  Just to clarify, I'm showing February 9th.

4     Q.  I'm sorry, February 9th.  Thank you.

5     A.  So if you're asking me if the February 9, 2015

6  letter, Chiari 0 or Chiari 1, a letter addressed

7  William J. Wagner, Junior, 5419 Roberts Road, Hamburg,

8  New York 14075.

9     Q.  Does a William J. Wagner, Junior live at that

10  address?

11     A.  I don't know if William J. Wagner, Junior lives

12  at that address.

13     Q.  So you sent a letter with a restraining notice

14  to a William J. Wagner, Junior that you don't know if

15  he lives at that address; is that correct?

16          MR. WOODARD:  Object to form.

17          THE WITNESS:  First of all, I didn't send

18  a letter with a restraining notice.

19  BY MR. ANDREWS:

20     Q.  Did a restraining notice go out that day?

21     A.  I don't know.  I'm looking at a letter.

22  There's no restraining notice with this letter.

23     Q.  Well, let's look back to Chiari 165, and we

24  look at the event date of 2/9/2015?

25     A.  Okay.

1    Q.   And there's a letter to debtor and information

2    subpoena to debtor?

3    A.   Correct.

4    Q.   So you did send out an information subpoena on

5    February 9, 2015?

6    A.   First of all, I didn't send out an information

7    subpoena on February 9, 2015.  Our records reflect the

8    fact that an information subpoena was prepared on

9    February 9, 2015.

10   Q.   So it was prepared, but not sent?

11   A.   I'm not saying it wasn't sent.  I'm saying I

12   didn't do that.

13   Q.   I'm not -- you're not testifying as to Bill

14   Ilecki.  I'm saying the firm, right, as the 30(b)(6)

15   witness did -- did --

16   A.   Well, I can testify as a thirty -- listen, I'm

17   testifying still on my own personal knowledge.  I'm

18   reading the same thing you're reading.  An information

19   subpoena was prepared by Melissa Overbeck.  I believe

20   she would have signed the information subpoena

21   immediately after preparing and provide that document

22   to a legal assistant to mail.  There's documentary

23   proof of the mailing.

24   Q.   So it was sent out then?

25   A.   I believe it was sent out, correct.

1  also -- she can testify to that, but she had told me

2  she also checked at some point Real Info, which

3  basically is a program that can find real property

4  assessment information.  Melissa would have done the

5  review to determine whether we had a good address for

6  the judgment debtor.  She would have done that review

7  on June 5, 2015.

8  BY MR. ANDREWS:

9     Q.  And that review indicates that LX, that stands

10  for Lexis?

11     A.  I -- yeah, I believe she -- that would have

12  been her initial for Lexis.

13     Q.  It says -- looks like WW, comma, SR, period, so

14  I assume that's William Wagner, Senior, and WW, comma,

15  JR, period, William Wagner, Junior, live at same

16  address.  Advised action to be sure to serve correct

17  DBTR, debtor?

18     A.  Yeah, that is the notation.

19     Q.  So what report did she rely on?  Did you

20  produce that reference report that she relied on?

21     A.  I don't know if that Lexis report was produced.

22  I doubt we could have produced a report from June 5,

23  2015.  We don't print or save the reports.  You may

24  have a report that would have had a date after June 5,

25  2015.  I do not know if it was produced.

1    Q.  Is that the report you're referring to?

2    A.  I have a report, Chiari 182.  It's a report

3   from Lexis dated December 31, 2015.

4           MR. WOODARD:  Chiari 182 to 191.

5           THE WITNESS:  Oh, I'm sorry.

6   BY MR. ANDREWS:

7    Q.  So you have this report.  You obviously printed

8   this.  It's not your procedure to print reports that

9   you used to determine the address of someone you're

10  going to serve a debtor exam on?

11   A.  We do not print.  It is my policy not to print

12  the Lexis reports.

13   Q.  But you printed this one?

14   A.  Generally.

15   Q.  You printed this one.  So why did you print

16  this one, the December 31st, and you didn't print the

17  one that Melissa...

18   A.  I think you -- this was printed in -- either in

19  response to your disclosure request or in anticipation

20  of litigation.

21   Q.  Going back to your prior testimony, when you

22  said there's a procedure in place to work accounts

23  that have judgment, is one of the actions undertaken

24  by the firm to send a subpoena duces tecum?

25   A.  That is one of the enforcement mechanisms that

1   we employ when appropriate.

2        Q.   And you send that to a debtor; correct?

3        A.   A subpoena duces tecum can be sent to my

4   debtor.  In my office, it's usually sent to a debtor.

5   It can be usually sent to non-debtors as well.

6        Q.   Non-debtors that --

7        A.   Non-judgment debtors.

8        Q.   In what regard would you send a subpoena duces

9   tecum to a non-debtor?

10            MR. WOODARD:  Form, go ahead.

11            THE WITNESS:  Well, again, there's an

12   exhaustive list of cases, but probably the most common

13   circumstance when you might send a subpoena duces

14   tecum to a non-debtor is if you have an employer

15   that's not cooperating with an income execution that

16   you feel the person is employed and you want to get

17   some documentation as to payment history or some

18   information as to why they're not complying with an

19   income execution.  We used to send sometimes

20   information to a bank if you needed to see bank

21   records.  Mostly when you need to see documentation is

22   when it's really valuable as to non-debtors.

23   BY MR. ANDREWS:

24        Q.   So fair to say you've sent it to a third-party

25   when they have some connection to the debtor, usually

1    a financial connection?

2        A.   You have to, that's the law.  There has to be a

3    reason why you're sending a subpoena to a third-party.

4    You have to have a good faith belief that a

5    third-party has information.

6        Q.   Just so we're clear, if you're not sending it

7    to the debtor, the third-party has to have some kind

8    of connection to that debtor?

9        A.   You have to have a reasonable belief that there

10   is a reason why the third-party might have information

11   or documentation.

12              (Whereupon, Exhibit Plaintiff's C, a Real

13   Info print-out, was marked for identification.)

14   BY MR. ANDREWS:

15       Q.   So you've got a document that's been marked as

16   Plaintiff's Exhibit C, and it's based stamped Chiari

17   192?

18       A.   Okay.

19       Q.   And it's -- the top it says real-info.com.  Is

20   this the -- is this a copy of a snapshot of a website

21   that your firm utilizes to identify addresses of

22   debtors?

23       A.   Among other things, yes.

24       Q.   And you testified that Melissa used this Real

25   I'll refer to it as in order to identify the debtor's

1   address as 5419 Roberts Road; is that right?

2       A.   I think I testified that I believe Melissa did

3   run a Real Info or Real record search.

4       Q.   Is this the search to the best of your

5   knowledge that she ran?

6       A.   It wouldn't have been the search because the

7   date of this document is May 9, 2016, but just to make

8   things easy, the results probably would have been the

9   same.  You know what, I have to -- actually, I have to

10  take that back because I see there's a sale date,

11  4/23/15, so that sale may not have appeared on the

12  date that Melissa may have run her Real Info search.

13  Generally, the information would be the same; however,

14  in terms of the property description, the tax

15  information would have a different tax year that might

16  have a different assessed value.

17      Q.   The ownership would be the same, assuming it's

18  a refi; is that right?

19      A.   In this case, because of the fact it was a very

20  recent sale, I'm not sure that the 2015 transfer --

21  you can see there was a transfer in 2015.  I'm not

22  sure that would have shown up on the search run by

23  Melissa.

24      Q.   And this particular document doesn't reference

25  William J. Wagner, Junior at 5419 Roberts Road;

 1   correct?

 2       A.   Well, it references -- it speaks for itself.

 3   It references a William Wagner at 5419 Roberts Road,

 4   Hamburg, New York 14075.

 5       Q.   But the debtor is William J. Wagner, Junior.

 6   It's a different name; correct?

 7                 MR. WOODARD:   Form.

 8                 THE WITNESS:   No, it's not.

 9                 MR. ANDREWS:   William Wagner and William

10   J. Wagner, Junior are not different names?

11                 MR. WOODARD:   Form.

12                 THE WITNESS:   They can be -- listen, they

13   can be the same name.  My name is William Ilecki.

14   It's also William J. Ilecki.  It's the same name.  I

15   mean, I answer to both.  If you're arguing that

16   William Wagner is identical in every respect to

17   William J. Wagner, Junior, of course not.  A J and a

18   junior are missing.

19   BY MR. ANDREWS:

20       Q.   I am going to show you a document that was

21   produced in response to plaintiff's discovery demands.

22   It's labeled Chiari 180 to 181.  It's a Trans Union

23   report.  Have you ever seen this particular report

24   before today?

25       A.   I probably have seen the report.  I don't

1   Q.   Is there a procedure for when a person provides

2   identifiers, in this case some other social security

3   number, as well as their date of birth, with respect

4   to verifying if that's the debtor?

5   A.   Yes.

6   Q.   What's that procedure?

7   A.   Well, again, it's a very broad statement, but

8   the procedure involves an attorney receiving

9   notification and the attorney having to review whether

10  it be a credit report, a public record search, some of

11  the other search tools we have such as Real Info,

12  Lexis or Westlaw in making a determination whether we

13  need additional information or whether the information

14  provided by the person making the telephone call was

15  correct or not correct.

16  Q.   Is this policy in writing anywhere?

17  A.   No.

18  Q.   Was it a mistake to have the subpoena duces

19  tecum served on the Roberts Road address?

20            MR. WOODARD:   Form.

21            THE WITNESS:   I don't know.

22  BY MR. ANDREWS:

23  Q.   You don't know if it was a mistake?

24  A.   No, I don't know.

25  Q.   Was that subpoena sent to that process server

1    with the intention to have the person residing at the

2    Roberts Road address served?

3                    MR. WOODARD:  Object to form.

4                    THE WITNESS:  Again, again, yeah, I mean,

5    your -- the form of your question is wrong.  I can

6    answer, and then if you want to follow-up with a

7    question, I'll provide you with testimony.  It was the

8    intention of the firm, as I testified, to serve the

9    judgment debtor at the address provided in the --

10   provided to the process server as long as the judgment

11   debtor resided, worked or -- at that address or that

12   address was the usual place of abode or dwelling

13   place.

14                   MR. ANDREWS:  Did you make any error or

15   mistake at any point during your contacts with my

16   client, Mr. Wagner, with respect to attempting to

17   collect the judgment in favor of MJ Peterson, Inc.?

18                   MR. WOODARD:  Object to form.

19                   THE WITNESS:  Again, in terms of the

20   contacts that were made with your client, could you

21   please -- could you please specify which

22   communications you're referencing?

23                   MR. ANDREWS:  The February 9th letter.

24                   MR. WOODARD:  Object to form.

25                   THE WITNESS:  Okay.  Here's -- okay, and I

```
 1    understand the objection to form.  We didn't send the
 2    February 9th letter to anyone other than the judgment
 3    debtor.
 4    BY MR. ANDREWS:
 5       Q.  You sent it to William J. Wagner, Junior at
 6    5419 Roberts Road, Hamburg, New York 14075; correct?
 7       A.  Correct.
 8       Q.  Who resides at 5419 Roberts Road, Hamburg, New
 9    York 14075?
10              MR. WOODARD:  Form.
11              THE WITNESS:  I don't know.
12              MR. ANDREWS:  So it's possible you're
13    sending a collection letter to someone that's not the
14    debtor?
15              MR. WOODARD:  Form.
16              THE WITNESS:  No, that's not possible.
17    BY MR. ANDREWS:
18       Q.  That's not possible?
19       A.  No.  In this case, no.
20       Q.  So you alleged as an affirmative defense bona
21    fide error; correct?
22       A.  In the answer, there is an affirmative defense
23    of bona fide error.
24       Q.  What's the error?
25       A.  The error is as alleged by the plaintiff.  To
```

1   the extent the plaintiff is correct in the plaintiff's

2   allegation that there was a violation of the Fair Debt

3   Collection Practices Act, we have a bona fide error

4   defense as to that violation.

5       Q.  What is the error?

6       A.  I don't think there's an error right now.  I

7   haven't made the determination if there is an error

8   and I'm not the judge.

9       Q.  Is it defendant's position that William J.

10  Wagner, Junior, if he's not the debtor, by serving

11  that person with a debtor exam, is that an attempt to

12  collect a debt?

13              MR. WOODARD:  Object to form.

14              THE WITNESS:  In this one I've just lost

15  the question, and if you could repeat it?

16  BY MR. ANDREWS:

17      Q.  Sure, I'll try to clean it up a little bit.

18          Is it defendant's position that service of a

19  subpoena duces tecum, a debtor exam, is an attempt to

20  collect a debt?

21      A.  I would agree that if you're talking about

22  service of a subpoena in a -- in a post-judgment

23  enforcement proceeding.

24      Q.  Correct.

25      A.  That would be an attempt to collect a debt.

1    Q.  And that subpoena was served on William J.

2  Wagner; correct?

3              MR. WOODARD:  Form.

4              THE WITNESS:  I don't know.  I don't know.

5  BY MR. ANDREWS:

6    Q.  If we look at Chiari 166, on 6/24/2015 of the

7  event log, action, dash, dash, AOS, dash, dash, ST --

8  SDT, dash, dash, personal service, and that stands for

9  affidavit of service, subpoena duces tecum, personal

10  service, is that --

11    A.  I would agree that that would be the reference

12  in the abbreviation.

13    Q.  So I'm going to ask you again, was William J.

14  Wagner served with a subpoena duces tecum?

15              MR. WOODARD:  Form.

16              THE WITNESS:  I don't know.

17  BY MR. ANDREWS:

18    Q.  When you read that, what does that indicate to

19  you, someone was served?

20    A.  What this entry indicates to me is that there

21  was personal service of the subpoena duces tecum.

22    Q.  And where was -- do you know the address to

23  which that service was affected?

24    A.  I don't have the document in front of me, but

25  the affidavit would speak for itself as to the

 1    address.

 2      Q.   Okay, fair enough.  Do you have the burden as

 3    the debt collector, the attorney, to identify the

 4    correct debtor or is the burden on the individual that

 5    you're attempting to contact to identify themselves as

 6    the debtor?

 7               MR. WOODARD:  Form.

 8               THE WITNESS:  Burden in what respect?  I

 9    mean, burden is a term of art.

10               MR. ANDREWS:  Burden not from a legal

11    standpoint, burden as it's your job in order to

12    satisfy the judgment to the best of your firm's

13    ability for your client?

14               MR. WOODARD:  Form.

15               THE WITNESS:  It's my job to attempt to

16    satisfy the judgment as legally permissible to the

17    best of my -- well, using reasonable means.

18    BY MR. ANDREWS:

19      Q.   Does a person that you contact with respect to

20    attempting to collect the judgment have any obligation

21    or duty to provide you with information that you can

22    ascertain their identity?

23      A.   Yes.

24      Q.   A non-debtor, a non-debtor has a duty to you?

25               MR. WOODARD:  Form.

```
 1                    THE WITNESS:  I don't think you asked
 2    that.
 3    BY MR. ANDREWS:
 4       Q.  I'll clarify it as a non-debtor.
 5       A.  A non-debtor can be required to provide
 6    information to me by way -- absolutely, a non-debtor
 7    can in some circumstances be required to provide
 8    information to me.
 9       Q.  So hypothetically speaking, my client, Mr.
10    Wagner, is not the debtor?
11       A.  Hypothetically speaking.
12       Q.  Hypothetically speaking, is he required then to
13    provide you information verifying that he is not the
14    debtor?
15                    MR. WOODARD:  Form.
16                    THE WITNESS:  If I subpoena your client,
17    that would be a requirement under the law.
18    BY MR. ANDREWS:
19       Q.  What about a phone call, is he required to give
20    you --
21       A.  There is no legal requirement for a non-debtor
22    to provide information identifying themselves as a
23    non-debtor during a telephone call with a
24    non-governmental agent.  You're talking about a legal
25    requirement and I want to stress that.
```

1    Q.   I just want to know if it's Chiari & Ilecki's

2  position as a policy, as a firm, that when they reach

3  out to consumers, to individuals that they believe is

4  a debtor, but they're not sure of, which is clearly in

5  this case based on your testimony --

6    A.   No, it's not my testimony.

7           MR. WOODARD:   Object to form.

8           THE WITNESS:   Absolutely, so ask it

9  differently.   I'm not going to answer that question.

10           MR. ANDREWS:   Is my client the debtor?

11           MR. WOODARD:   Object to form.

12           THE WITNESS:   I don't know.

13  BY MR. ANDREWS:

14    Q.   So you can't say today whether he's the debtor?

15    A.   I cannot.

16    Q.   So my question is this.   In this instance, you

17  don't know whether or not the person you've reached

18  out to via a letter, an attempted information subpoena

19  and a personal service of a debtor exam is the debtor;

20  correct?

21           MR. WOODARD:   Form, object to form.

22           THE WITNESS:   Actually, see, again, I've

23  already answered that, and really, I'm not trying to

24  be difficult.   You're missing the point.   We did reach

25  out to the debtor, to the judgment debtor.   Every

1    action we've taken is against the judgment debtor.

2    Whether the judgment debtor is your client, I can't

3    answer that.   That's the difference.   What's with the

4    smirks, Seth?

5    BY MR. ANDREWS:

6       Q.   Because it's -- you can't have it both ways,

7    Bill.   You can't have it both ways.

8       A.   You actually can.

9       Q.   I don't want to get into another argument

10   because it's not appropriate for this.

11          If a person fails to respond to a subpoena, is

12   it common for your office to proceed with an

13   enforcement motion?

14      A.   Yes.

15      Q.   And your office has --

16      A.   Properly served subpoena.

17      Q.   Yes, and your office has filed such motions in

18   the past?

19      A.   When appropriate, we have filed motions to

20   enforce a subpoena.

21      Q.   In fact, is it in your written procedures to do

22   such?

23              MR. WOODARD:   Form.

24              THE WITNESS:   It's not in my written -- if

25   you're talking about -- actually, I have to clarify.

ERRATA SHEET

PAGE  LINE
8   17
change: _____ "CHASE" FOR CASE
reason: _____ TYPO

8   20
change: _____ "NOR" FOR OR
reason: _____ TYPO

12  4
change: _____ "REINGOLD" FOR "RYAN GOLD"
reason: _____ TYPO

20  15
change: _____ "2006" FOR 2016 - 2 PLACES
reason: _____ TYPO

25  23,24
change: _____ DELETE PERIOD AFTER ADDRESS
reason: _____ REMAINDER UNINTELLIGIBLE

34  18
change: _____ "POSTAL SERVICE FOR "POST"
reason: _____ TYPO

change: _____
reason: _____

change: _____
reason: _____

change: _____
reason: _____

I _____ WILLIAM ILECKI _____ hereby certify
that I did review and if necessary correct this
deposition and that the foregoing pages _1_ through
_77_ are a true and accurate recording of said
proceedings.
            PER ERRATA CHANGES -

Subscribed and sworn to before me this
_15_ day of _____ , 20 _17_ .

_____
Notary Public

MELISSA LYNN OVERBECK
Notary Public - State of New York
Qualified in Erie County
No. 02OV6266364
Commission Expires July 23, 2020

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969