# EXHIBIT H

*WILLIAM J. WAGNER vs.*
*CHIARI & ILECKI, LLP.*

*WILLIAM ILECKI, ESQ.*
*October 5, 2016*



METSCHL
AND ASSOCIATES
COURT REPORTERS • LEGAL VIDEO SERVICES

**Buffalo, NY**: 716 856-1906
**Rochester, NY**: 585 697-0969
**Toll Free**: 800 397-1796

*Min-U-Script® with Word Index*

1

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    _____

4    WILLIAM J. WAGNER,

5          Plaintiff,

6          vs              Docket No. 15-CV-633-JTC

7

8    CHIARI & ILECKI, LLP,

9          Defendant.
     _____

10

11   Examination Before Trial of WILLIAM ILECKI, ESQ., held

12   pursuant to the Federal Rules of Civil Procedure, in

13   the law offices of CONNORS LLP, 1000 Liberty Building,

14   424 Main Street, Buffalo, New York, on Wednesday,

15   October 5, 2016 at 10:08 a.m. before Molly Fenske,

16   Notary Public.

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

     LAW OFFICES OF KENNETH HILLER, PLLC
 3   BY:   SETH J. ANDREWS, ESQ.
     6000 North Bailey Avenue, Suite 1A
 4   Amherst, New York  14226
     sandrews@kennethhiller.com
 5   Appearing for the Plaintiff.

 6

     CONNORS LLP
 7   BY:   PAUL A. WOODARD, ESQ.
     1000 Liberty Building
 8   424 Main Street
     Buffalo, New York  14202
 9   paw@connorsllp.com
     Appearing for the Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX TO WITNESS

 2

 3   WILLIAM ILECKI, ESQ.                         PAGE

 4

 5   Examination by Mr. Andrews....................6

 6

 7

 8

 9                   INDEX TO EXHIBITS

10

11   EXHIBIT                                      PAGE

12

13   Exhibit Plaintiff's A, events sheet...........18

14   Exhibit Plaintiff's B, E-mail.................49

15   Exhibit Plaintiff's C, Real Info print-out.....57

16   Exhibit Plaintiff's D, Trans Union report......61

17              Exhibits retained by counsel.

18

19

20

21

22

23

24

25
```

```
 1              (Whereupon, the following stipulations
 2    were entered into by the respective parties:
 3              It is hereby stipulated by and between
 4    counsel for the respective parties that the oath of
 5    the referee is waived, that filing and certification
 6    of the transcript are waived, and all objections,
 7    except as to the form of the question, are reserved
 8    until the time of trial.)
 9              THE REPORTER:  Mr. Andrews, you'll supply
10    Mr. Woodard?
11              MR. ANDREWS:  Yes.
12              THE REPORTER:  Usual stipulations or read
13    and sign?
14              THE WITNESS:  Usual stipulations are fine
15    with me because it allows me the opportunity to review
16    it.
17              MR. WOODARD:  Yeah, perfect.
18              (A recess was taken.)
19              THE REPORTER:  Would you like sixty days?
20              MR. WOODARD:  That would be great.  Is
21    that okay?
22              THE WITNESS:  Yeah.
23              WILLIAM ILECKI, ESQ., 371 Starin Avenue,
24    Buffalo, New York 14216, having been duly called and
25    sworn, was examined and testified as follows:
```

1            MR. ANDREWS:  Mr. Ilecki, my name is Seth

2    Andrews.  I'm the attorney for the plaintiff, William

3    J. Wagner, in this matter.  Mr. Wagner filed a lawsuit

4    in the Western District of New York naming Chiari and

5    Ilecki as a defendant alleging violations of the Fair

6    Debt Collection Practices Act.

7            You've been designated as the 30(b)(6)

8    witness for today's deposition.  I will be asking you

9    questions in that capacity.  You've also been noticed

10   as a 30(b)(1) witness.  I'll be sure to indicate if my

11   question pertains to you.  Otherwise, you should

12   assume that it's the 30(b)(6) as you're testifying; is

13   that understood?

14           THE WITNESS:  I understand, so you're

15   telling me you will reference specifically if I'm to

16   answer as an individual witness?

17           MR. ANDREWS:  Correct.  Otherwise, assume

18   the question is posed --

19           THE WITNESS:  I understand.

20           MR. ANDREWS:  Before we begin, I'm sure as

21   an attorney you know this, but I just want to cover

22   some ground rules.

23           I'm going to ask you some questions.  Do

24   your best to provide me with responses.

25           Please try to wait until I finish before

1    you answer, even if you think you know where I'm going

2    or, you know, so we can keep a clear record for the

3    court reporter.

4              If at any time you need a break, please

5    let me know.  I just ask that if there's a pending

6    question, you answer it prior to any break.

7              You've got to give verbal responses, and

8    that's pretty much it.

9    EXAMINATION BY MR. ANDREWS:

10      Q.  Have you -- is there any reason you can't

11   provide truthful and accurate testimony today?

12      A.  There is no reason I cannot provide truthful

13   and accurate testimony to the best of my knowledge.

14      Q.  No medications that would prevent recall?

15   You're not on any medication that would...

16      A.  I'm not on any medication that would prevent

17   recall.

18      Q.  What's your date of birth?

19      A.  ██████  1964.

20      Q.  Where were you born?

21      A.  Buffalo, New York.

22      Q.  And what's the highest level of education

23   you've obtained?

24      A.  Graduated from law school.

25      Q.  And where did you graduate from?

1    A.   University of Buffalo.

2    Q.   Do you recall when you graduated?

3    A.   Yes, 1989.

4    Q.   And in preparation for today's examination, did

5   you discuss the case with anyone other than your

6   attorney?

7    A.   I did not discuss the case in detail with

8   anyone else, although there was a meeting at my office

9   with my staff that is scheduled to be testifying today

10  with my attorney.

11   Q.   So the attorney was present for this meeting?

12   A.   Yes.

13   Q.   Okay.  Did you have any discussions with anyone

14  outside of your attorney in preparation for today's

15  deposition?

16   A.   I did have discussion with the people that are

17  testifying today.

18   Q.   Outside of the presence of your attorney?

19   A.   Correct.

20   Q.   What did you discuss?

21   A.   Scheduling with them, how we would cover my

22  office while they're gone, and also, we discussed

23  whether I might be present during their testimony.

24   Q.   Did you discuss any specific defenses or in any

25  way discuss any factual or legal issues of the case?

1    A.  With Melissa Overbeck I did, but as to the

2   other individuals, no.

3    Q.  What did you discuss with Melissa?

4    A.  With Melissa Overbeck, we reviewed the

5   responses to the disclosure demands both by the

6   defendant and by the plaintiff, and we also did

7   discuss generally how -- whether I would be present

8   when she was testifying, and also, you know, the

9   timing of her testimony just as I indicated with the

10   other individuals.

11    Q.  But nothing with respect to anything specific

12   in terms of -- you mentioned responses.  Were there

13   any particular responses that you discussed?

14    A.  It was a very general conversation in terms of

15   me advising her I was going to review the responses

16   before I testified and she should also review the

17   responses before she testified.

18    Q.  So general housekeeping; fair to say?

19    A.  Yeah.  To cut to the case, I did not tell her

20   how I was going to testify or did not tell her how she

21   should testify.

22    Q.  No, I assumed that.  I was just wondering if

23   there was certain specific things that you guys

24   discussed, but it sounds like it was just more

25   scheduling; fair to say?

1        A.    Except with Melissa, we did discuss the fact

2    that we would both review the documents provided to

3    us, both by -- the plaintiff's responses to discovery

4    demands, those documents were provided to us by our

5    attorney, as well as our responses, the defendant's

6    responses to plaintiff's discovery demands.

7        Q.    Did you review those responses separately or

8    jointly?

9        A.    Separately.

10        Q.    Have you ever testified in court before?

11        A.    Yes.

12        Q.    How many times?

13        A.    In court, I believe twice.

14        Q.    And that was as a party or a witness?

15        A.    One was a party and one was as a witness.

16        Q.    And the party, were you a plaintiff or the

17    defendant?

18        A.    I was the plaintiff.

19        Q.    And again, this is Chiari and Ilecki we're

20    speaking of; right?  We're not talking about William?

21        A.    Well, you asked me if I was here testifying, if

22    I ever testified, and I guess your point was -- I'm

23    talking about unless you specified that I was talking

24    about me individually, that I would be testifying as a

25    representative of Chiari & Ilecki.

1    Q.  Let me rephrase so we're clear.

2    A.  But I can't imagine how Chiari & Ilecki could

3   testify, so the question has to be about me

4   personally.  The firm can't testify.

5    Q.  Well, the firm can have a representative, you

6   know?

7    A.  But you asked if I ever testified.

8    Q.  In your capacity as the firm, not you, not Bill

9   Ilecki being a named --

10   A.  In my capacity as a representative of the firm,

11  I do not believe I've ever testified in court.

12   Q.  Have you ever provided any prior deposition

13  testimony in your capacity as a principal of the firm?

14   A.  I did testify once, so the answer is yes.  It

15  was a predecessor firm.  The firms merged, so yes.  If

16  you're counting Chiari & Ilecki as the same entity

17  that merged into Chiari & Ilecki, yes, I did testify.

18   Q.  And what was that case involving?

19   A.  That case involved a malpractice claim against

20  the firm relative to real estate transaction.

21   Q.  The other instance I believe you said you

22  testified as a witness; is that correct?

23   A.  What other case?

24   Q.  You said -- I don't want to misconstrue your

25  testimony.  I thought you said that you testified as a

 1   party and also as a witness?

 2      A.   Correct, but as you pointed out, not related to

 3   the firm, not related to an action involving the firm.

 4      Q.   Okay.   What was that action regarding?

 5      A.   Just to be clear, so now you want me to answer

 6   as a personal witness?

 7      Q.   Yeah, because you're saying that you were a

 8   witness not involved with Chiari & Ilecki.

 9      A.   So now you're asking me to testify personally

10   as witness?

11      Q.   Correct.

12      A.   And you're asking me the nature of the actions

13   where I testified?

14      Q.   As a witness.

15      A.   The one action I testified as a party was my

16   divorce, and the other action where I testified as a

17   witness was a -- involved a motion to vacate a

18   judgment.

19      Q.   That your firm wasn't involved in that motion?

20      A.   My firm -- that's not the question that you

21   asked though.   My firm was not a party.

22      Q.   So you were a witness and provided testimony

23   regarding a motion to vacate a judgment, and was that

24   judgment creditor represented by your office?

25      A.   Yes, correct.

1    Q.  After you graduated law school, do you recall

2  where you first were employed?

3    A.  Yes, I was employed -- I was a law clerk for

4  Joseph Ryan Gold.

5    Q.  And how long did you do that for?

6    A.  I had been a law clerk for him just a little

7  over two years.

8    Q.  And then after clerking, what came next?

9    A.  Then I went to work for a company called Action

10  Management, Incorporated.

11    Q.  What kind of work do they do -- did they do?

12    A.  They were a collection agency.

13    Q.  Collection agency, okay.

14      Were you in-house counsel?

15    A.  In-house counsel, yes.

16    Q.  How long did you work for them for?

17    A.  About six months, maybe five months.

18    Q.  And then what was after?

19    A.  Then I -- my next job was with -- at the time

20  was Horwitz and Frankel was the name.

21    Q.  And how long were you with them for?

22    A.  That's the firm that continues to this day.

23    Q.  All right, so you've been -- three different

24  transitions or is there more?

25    A.  When you say transitions, you mean three

```
 1   different -- I've had since -- since graduating from
 2   law school, I've had --
 3      Q.   Your firm, your current firm went through three
 4   different name transitions?
 5      A.   Okay.   The firm was initially Horwitz and
 6   Frankel.   The next -- and that's F-R-A-N-K-E-L, and
 7   Horwitz is H-O-R-W-I-T-Z; changed the name to Horwitz,
 8   Frankel and Ilecki; then Horwitz and Ilecki; and then
 9   we merged in 2006 to become Bulan, B as in Brian,
10   U-L-A-N as in Nancy, Chiari, Horwitz and Ilecki; and
11   then we shortened the name in 2010 to Chiari & Ilecki.
12      Q.   Starting when it was first Horwitz to the
13   present, Chiari & Ilecki, how long has your tenure
14   been with the firm?
15      A.   I believe twenty-six years, twenty-five, maybe
16   a little less than twenty-five years or twenty-six --
17   maybe a little less than twenty-six years, more than
18   twenty-five years.
19      Q.   And during that time, this is now a question
20   for you as a (b)(1) witness, does your practice -- did
21   your practice from beginning to end involve the
22   collection of debts?
23      A.   Yes.
24      Q.   Does Chiari & Ilecki handle any other type of
25   matters besides debt collection?
```

1     A.   Yes.

2     Q.   What other matters, generally speaking?

3     A.   Landlord-tenant, some minor estate and real

4  estate.

5     Q.   The vast majority is debt collection though?

6     A.   The majority is debt collection, yes.

7     Q.   And approximately how many employees are there

8  at Chiari & Ilecki?

9     A.   Thirteen.

10     Q.   How many attorneys are there at Chiari &

11  Ilecki?

12     A.   There are five attorneys in the firm.  We have

13  two attorneys that we have in an of counsel position.

14     Q.   Do those two of counsel count for the thirteen?

15     A.   No, they're not employees.  They don't count as

16  the five either.

17     Q.   So eight non-attorney employees?

18     A.   No, you asked how many attorneys.  There are

19  two partners, three attorneys.

20     Q.   And then my next question is how many if -- you

21  said thirteen; right?  So eight non-attorney

22  employees?

23     A.   That would be ten.  The partners aren't

24  employees.

25     Q.   You work for a living.

1    A.   Not as an employee, it's a lot worse.

2    Q.   Are employees at Chiari & Ilecki trained in

3  Fair Debt Collection Practices Act compliance?

4    A.   Yes.

5    Q.   Who trains them?

6    A.   I do primarily.  We have also had the employees

7  take and have to pass a course in Fair Debt Collection

8  Practices Act law.

9    Q.   Is that course administered by a third-party or

10  is it internal?

11    A.   It was a third-party.

12    Q.   Is that still the policy today?

13    A.   Yes, yeah.

14    Q.   At the time of the allegations in the

15  complaint, February 2015 through June 2015 --

16    A.   Before you finish, the attorneys also attend

17  seminars too.

18    Q.   Okay.  Was that policy also in place during

19  that time period as well?

20    A.   During the time period of the --

21    Q.   Of the alleged --

22    A.   -- relevant allegations in this action, yes.

23    Q.   Okay.  What is the process if someone doesn't

24  pass the exam?

25    A.   I don't think we've ever had somebody who

1   didn't pass the test, everybody has.  They wouldn't be

2   allowed to handle any collections communications.

3       Q.  Is that test --

4       A.  With debtors, with debtors.

5       Q.  Is that test provided prior to they -- they

6   start working active accounts?

7       A.  Well, there's a big difference between working

8   an account and communications with debtors because we

9   can have someone that inputs mail.  You might call it

10  working an account.  I might even call it working an

11  account, but it doesn't mean there's a communication

12  with the debtor.  We can have somebody answer the

13  phone and simply transfer calls.  They may not have

14  taken that test yet, although they would have received

15  my initial training and they would have received

16  materials that I provide, which basically are copies

17  of the law, of the statutes, state and federal,

18  effecting debt collection.

19      Q.  So does an employee, before they can have any

20  contact with a debtor or any what I'll call meaningful

21  work product done on the account, skip tracing,

22  identifying assets, things of that nature, do they

23  have to pass this third-party test?

24              MR. WOODARD:  Form.

25              THE WITNESS:  Yeah, I'm going to ask you

```
 1    to clarify that because you're presuming that the
 2    employees do those things.  The question presumes it.
 3    Maybe it would help -- I'm not -- just to speed things
 4    up, it might help if I explained the skip tracing
 5    portion.
 6    BY MR. ANDREWS:
 7        Q.  Well, do non-attorneys skip trace?
 8        A.  Generally, no.
 9        Q.  Okay.
10        A.  The attorneys and primarily me, I do all the
11    initial skip tracing on every file.
12        Q.  Did you do it on Mr. Wagner's?
13        A.  On Mr. Wagner's file, yes.  Now, let me just
14    state this.  Mr. Wagner's file is so old that it may
15    have been sued by a -- by our predecessor firm.  It
16    may have been sued by Goldstein, Bulan and Chiari.  So
17    it was the firm we merged with, but once the file was
18    placed in our system, I reviewed the file.
19        Q.  Once it was placed in the Chiari and --
20        A.  Once we -- right, correct, so I would have
21    reviewed the files initially, which is the process
22    that we have.  Now, you had asked about skip tracing.
23        Q.  Hang on one second, I want to...
24        A.  I just want to -- I have to complete the
25    answer.
```

1          There are two paralegals that I have trained to

2     skip trace.  They do very little of it, but they have

3     been starting to review our records for skip tracing

4     purposes.

5        Q.  Did either of those individuals have any skip

6     tracing activity done on Mr. Wagner's file?

7        A.  No.

8        Q.  This is a document that was produced by the

9     defendant in response to plaintiff's discovery

10    demands.  It's bates labeled Chiari 164, 165 and 166.

11    Do you see that?

12       A.  I see 164.  I see 165 and I see 166, yes.

13       Q.  Can you explain to me what this is?

14             MR. WOODARD:  Are we marking this or no?

15             MR. ANDREWS:  No, not yet.

16             THE WITNESS:  This document is a print-out

17    of an Excel spreadsheet that details the -- we call

18    them events, things that happen on a file that are

19    noted on our Microsoft Access database program.  It's

20    a proprietary program, and this document relates to

21    the events on the William J. Wagner, Junior file that

22    we have where our client is MJ Peterson, LLC.

23             (Whereupon, Exhibit Plaintiff's A, an

24    events sheet, was marked for identification.)

25    BY MR. ANDREWS:

1     Q.   Mr. Ilecki, you previously testified that you

2     do the skip tracing on this account; correct?   Initial

3     skip tracing?

4     A.   The initial -- the initial account.  As I've

5     indicated, this account was so old it actually was

6     initially opened and a judgment taken by Goldstein,

7     Bulan and Chiari.

8     Q.   So when Chiari & Ilecki received it, it was in

9     a judgment status?

10    A.   Correct.  Well, again, I have to clarify it.

11    After the merger or before the merger it was in a

12    judgment status, yes.

13    Q.   So did you do any skip tracing during the time

14    periods that are indicated on this document, which

15    would be from September of 2006 through June of 2015?

16    A.   The skip tracing would have occurred before the

17    file was even converted, the initial skip tracing.

18    Q.   I understand that.  I'm saying did you do an

19    additional skip tracing on this account?

20    A.   Myself personally, it does not look like I did

21    any work on the file whatsoever.

22    Q.   So why don't you take a moment, unless you know

23    the answer off the top of your head, and review it

24    with respect to who did the skip tracing from

25    September 2006 through June of 2015 for this file?

```
 1      A.  Well, I probably did the skip tracing before
 2   the file was converted.
 3      Q.  But I want to --
 4      A.  So that might have been in September.  Your
 5   question was September 2016 (sic), so it may have been
 6   September in 2016 when I gave it to someone to convert
 7   on our system.  See, they didn't have a computer
 8   system at Goldstein, Bulan and Chiari, so there
 9   wouldn't have been any way to keep track of what they
10   did to review an account.
11      Q.  So if we look at 164?
12      A.  Okay.
13      Q.  And we look at, oh, I don't know, event
14   comment.  It says --
15      A.  I'm at page 164.
16      Q.  Yep.
17      A.  Which event?
18      Q.  Event comment, and I'm going to read the
19   comment.  It says letter to server to serve.  Do you
20   see that?
21      A.  If you give me a date, you'll see there are
22   dates here.
23      Q.  August 10, 2007 event date?
24      A.  Okay, so August 10, 2007.  I do see the
25   document.
```

1    Q.  It says letter to server to serve?

2    A.  Correct.

3    Q.  And you're serving an order to show cause?

4    A.  Okay.

5    Q.  Is that correct, or attempted to, attempted to?

6    A.  It looks like on August 9th we received a copy

7 of a filed order to show cause to punish the judgment

8 debtor for contempt for non-compliance with an

9 information subpoena, and then on August 10th a letter

10 was sent to the server to serve that order to show

11 cause.

12    Q.  And then you received an affidavit of

13 non-service stating that the debtor no longer lives at

14 378 Windermere Boulevard; is that right?

15    A.  It looks like on August 14, 2007 we received

16 from our process server either an affidavit of

17 non-service or a letter of non-service indicating that

18 the address at 378 Windermere was not correct.

19    Q.  So my question is what steps did you take to

20 identify that address as the correct address for the

21 debtor?

22    A.  You mean initially, before we sent the order to

23 show cause out for service?

24    Q.  Yes.

25    A.  At this time we had a Lexis program, and I

```
 1   don't know if it was SmartLinx back in 2007, although
 2   I believe it was called SmartLinx in 2007.  So the
 3   effort that we would have taken would have been to
 4   review that SmartLinx program to confirm that the
 5   address on Windermere was showing as a correct
 6   address, as well as to review the file itself.
 7      Q.  That report doesn't show up on this activity
 8   log?
 9      A.  What report?
10      Q.  The report you just testified you would have
11   reviewed, this Lexis report; correct?
12      A.  You asked me what we did to confirm this
13   address, and I'm saying that is done -- the initial
14   review is done before the file is even converted, so
15   there wouldn't have been any notation because we
16   didn't have the file in our system.
17      Q.  Let's back up.  So you said that there was no
18   -- the prior incarnation of Chiari & Ilecki, Bulan,
19   Chiari, Horwitz and Ilecki, do I have that right?
20      A.  Bulan, Chiari, Horwitz and Ilecki was created
21   in 2006.  We -- our first date I think where we
22   practiced was August 2006.
23      Q.  That's the direct predecessor to Chiari &
24   Ilecki; correct?
25              MR. WOODARD:  Form.
```

```
1              THE WITNESS:  Actually, that is -- when
2    you say predecessor, we just simply changed the name.
3    BY MR. ANDREWS:
4       Q.  All right, so it's the same entity?
5       A.  It's the same entity.
6       Q.  This William J. Wagner file was received by the
7    firm, and at that time, there wasn't any case
8    management system in place?
9              MR. WOODARD:  Object to form.
10             THE WITNESS:  Yeah, I can -- there was no
11   case management system, computerized case management
12   system employed by Goldstein, Bulan and Chiari.
13   Goldstein, Bulan and Chiari filed the lawsuit and took
14   the judgment.  So the judgment was in place by
15   Goldstein, Bulan and Chiari, and they either submitted
16   the judgment before the merger or actually obtained
17   the judgment before the merger, so nothing would have
18   been done by that 2006 merged firm.  Nothing would
19   have been done to obtain the judgment.
20   BY MR. ANDREWS:
21      Q.  So my -- I guess what I'm trying to get at is
22   this is the only record you have of activity done on
23   the account.  Anything prior, there was no -- there's
24   no case management tracking of it; correct?
25      A.  Okay.  There are copies.  There are copies of
```

1    documents, but there's no case management system,

2    whether it be computerized or written, where an

3    attorney would actually write notes of everything that

4    happened.

5        Q.   So when you previously testified that the

6    address 378 Windermere Boulevard was determined to be

7    the address through a Lexis search, is that from

8    memory?  Because there's no record of that as far as

9    an activity log because there was no case management

10   system at the time; correct?

11       A.   Again, I'm going to object to the form myself

12   because there's a lot in that question.  Before a file

13   is placed on our computer database, I review the file.

14   I review the Lexis program.  Today, it's a Westlaw

15   program.  We also have a Lexis program.  We actually

16   have both, but it's accurate today.  There's no more

17   SmartLinx, so I review those websites.  That review is

18   done before a file is placed on our computer system,

19   so you will never see a notation before a file is open

20   that a review is made.  It's just done.

21       Q.   And you know that because you're the only one

22   that does it?

23       A.   I'm not the only one that does it.  My

24   paralegal today is reviewing new files and then I

25   review after her.  I have had attorneys also review

 1  files, attorneys I'm training for example.  All new

 2  attorneys that start, I have them review Westlaw and

 3  Lexis.  For the new attorneys, I then review what

 4  they've looked at.  They will -- it's part of the

 5  training.  So back in 2006, other than me, I don't

 6  know who else at that time would have also reviewed

 7  the file before the conversion.

 8     Q.  Okay.  So is there a procedure in place then --

 9  after that initial Lexis search was done, is there a

10  procedure in place to determine a proper address upon

11  being notified that the address you thought was good

12  based on your Lexis search, which turns out isn't, is

13  there a procedure that would help you identify a good

14  address?

15     A.  Correct.

16          MR. WOODARD:  I'm just going to object to

17  I guess asking to some extent this line of questioning

18  and asking him about procedures in place at a time

19  that's not really relevant to the lawsuit.  I'll give

20  you some leeway, but I just do want to note the

21  objection.

22          THE WITNESS:  And I appreciate it.  There

23  have been procedures in place.  To determine a correct

24  address, you have to be notified of an incorrect

25  address my entire practice, so that's a fact.

1           Now, I do want to say that we also run

2   credit reports.  I cannot tell here when we ran a

3   credit report first because I don't remember when we

4   started including the requests for a credit report in

5   the events.  The credit report used to be requested

6   without an event being created.  So in addition to a

7   Lexis or Westlaw search, there is a review of credit

8   reports done on every file at some point where we have

9   a judgment just about, unless it's paid or a

10  bankruptcy is filed.

11  BY MR. ANDREWS:

12      Q.   If we go back to 164, and if we look at May 10,

13  2011 for the event date?  Are you with me?

14      A.   Yep.

15      Q.   And it looks like it says previous address,

16  1571 Eggert Road, Wagner, William J.?

17      A.   Okay.

18      Q.   How did you determine if 1571 Eggert Road was a

19  possible address?

20      A.   Well, I again would not have been the one who

21  would have reviewed this, but you can see prior to the

22  May 10, 2011 events, you will see the attorneys who

23  reviewed the file for actually over two years, over a

24  two-year period.  So I -- so they would have been the

25  ones who determined a new address, and they would have

1   determined a new address reviewing credit reports and

2   Lexis primarily.  Of course, they could have also

3   determined new address in this case from a PO.  It

4   looks like a PO box letter that may have gone out or a

5   judgment letter may have gone out because you look at

6   the event on April 7, 2011, letter, post office

7   address request, that is a letter to the post office

8   requesting a new address.

9        Q.  And presumably then the post office provided

10   1571 Eggert Road?

11             MR. WOODARD:  Form.

12             THE WITNESS:  Well, we have on April 14,

13   2011, actually, I don't have -- other than the April

14   14, 2011, you'll see the USPS PO box letter returned.

15   It looks like no change of address that you would see

16   on April 14, 2011.

17   BY MR. ANDREWS:

18        Q.  So at this point, we're in 2011.  The file was

19   opened sometime prior to September of 2006; is that

20   correct?

21        A.  Again, the file would have been opened by

22   Goldstein, Bulan and Chiari before September 2006.

23        Q.  So we're five years in, and has there been any

24   contact with the debtor at this point that you can see

25   from this event log?

1      A.   Well, there would have been contact with the
2  debtor by the prior firm.

3      Q.   How do you know that?

4      A.   They served the debtor.

5      Q.   Was he personally served?

6      A.   I don't know how he was served, but he was
7  served.

8      Q.   Do you know if it was a default judgment
9  entered?

10      A.   I do not know, but I do not know off the top of
11  my head, but it would be in the documentation.

12      Q.   After entry of the judgment, do you know if
13  there was any contact between September '06 and May of
14  2011 with the debtor?

15      A.   From September 2006?

16      Q.   To May of 2011, which...

17      A.   There was contact.

18      Q.   What contact?

19      A.   There was a letter sent to the debtor on
20  January 13, 2007.

21      Q.   For a contempt motion?

22      A.   No.

23      Q.   I apologize.  I see, yep.  That's the letter
24  informing that Chiari & Ilecki is now handling the
25  matter?

1      A.   It is a letter informing the debtor of the new

2    -- of the merged firm handling the matter, providing

3    that letter also includes the CPLR 5222, notice of

4    judgment debtor.   It would have included a copy of the

5    judgment as well.

6      Q.   And that was sent certified, the debtor signed

7    for that letter?

8      A.   No.

9      Q.   So you don't know whether he received the

10   letter then?

11     A.   Well, the letter was mailed to the debtor.

12     Q.   I know, but what I'm trying to ask is you can

13   mail a letter, but maybe that's not the correct

14   address.   Do you have any knowledge that he received

15   that letter?   It wasn't sent certified.   He didn't

16   sign for it; correct?

17     A.   There is a presumption of mailing, so I have

18   that knowledge.

19     Q.   If that address happens to be the correct

20   address?

21     A.   What do you mean by correct address?   I need to

22   clarify that.

23     Q.   Well, you can mail something and there's a

24   presumption that whoever it's addressed to receives

25   it, but if they're not living at that address, they

```
 1   don't reside at that address, then they wouldn't
 2   receive it; correct?
 3                MR. WOODARD:   Form.
 4                THE WITNESS:   That's incorrect.
 5                MR. ANDREWS:   So you can mail something to
 6   someone -- your testimony today is you can mail some
 7   -- mail correspondence to an address, and regardless
 8   of that -- whether or not in reality the person
 9   resides at that address, they're deemed to have
10   received that?
11                MR. WOODARD:   Form.
12                THE WITNESS:   That's a different question.
13   BY MR. ANDREWS:
14      Q.   I want to know what proof you have that the
15   debtor received that letter in January of 2007.
16      A.   One of the methods of proof we have is the
17   letter was mailed and not returned.
18      Q.   What -- you said one of them, what other...
19      A.   The presumption of mailing.
20      Q.   Is it possible that the letter was sent to that
21   address and someone else lived there and just simply
22   threw it away?
23      A.   If you're asking me a hypothetical, that is
24   always a possibility in every single piece of mail
25   that's ever mailed.
```

1      Q.   What I'm -- just to clarify, the debtor never

2    called into the office stating he received this letter

3    in January of 2007; correct?

4      A.   In January of 2007, we have -- we received no

5    telephone calls from the judgment debtor.

6      Q.   The debtor never sent any correspondence saying

7    he received a letter on January 13, 2007, never sent

8    you a letter back saying I got --

9      A.   That is correct.  In January 2007, there's no

10   correspondence from the debtor.

11     Q.   You never received any slip from the post

12   office, again, saying that he signed for this letter,

13   receipt of this letter?

14     A.   We would not have received a slip from the post

15   office.

16     Q.   But you didn't send it certified; correct?

17     A.   We did not send the letter certified.

18     Q.   All right.  So let's look again at May 10,

19   2011, and you send a letter to 1571 Eggert Road, as

20   well as an information subpoena to that address; is

21   that correct?

22     A.   No, that would not be correct.

23     Q.   I see May 10, 2011, document, letter to debtor.

24   What address?  What address was that letter sent to?

25     A.   I don't know from this computer print-out what

1    address that notice would have been sent to.  I might

2    be able to determine that address however, either

3    looking at the document or seeing if there was another

4    address.  If I had to guess, I would say we sent the

5    letter and the information subpoena to 102 Reiman

6    Street.

7        Q.  At one point though -- well, I'm showing you a

8    document that's been produced in response to

9    plaintiff's request for discovery to the defendant.

10   It's labeled Chiari 132.  It's an April 4, 2011 letter

11   addressed to William J. Wagner, Junior at 1571 Eggert

12   Road, Amherst, New York 14226.  So any indication that

13   the debtor received this letter other than the

14   presumption of mailing?

15       A.  There is no indication that the defendant

16   received this letter.  I mean, he didn't get the

17   letter.

18       Q.  Okay.

19       A.  There's an indication he did not.

20       Q.  And so then next you send this letter, May 10,

21   2011; is that right?  And that's the next letter that

22   would have went?

23       A.  Correct.

24              MR. WOODARD:  Chiari 138.

25   BY MR. ANDREWS:

1    Q.   Yeah, Chiari 138.

2    A.   Correct, Chiari 138 is a letter sent to the

3    judgment debtor on May 10, 2011.

4    Q.   Any indication that he received this letter?

5    A.   Yes.

6    Q.   And how do you know that?

7    A.   The letter was not returned by the post office

8    and the presumption of mailing.

9    Q.   Okay.  Outside of those two, again, the William

10   J. Wagner, Junior never called in; correct?  After

11   sending out this letter?

12   A.   Well, I have to look at the rest of the events

13   to see if he ever called in.  If you're asking if he

14   called in within a month of the letter, it does not

15   appear that we had contact from the judgment debtor in

16   response to this letter.

17   Q.   Did he ever send any -- can you tell if he ever

18   sent any correspondence in response to this letter?

19   A.   Again, it appears that there was no

20   correspondence from the defendant -- from the judgment

21   debtor within a reasonable time after this letter.

22   Q.   And was that information subpoena, was that

23   returned?

24   A.   Which information subpoena?

25   Q.   The information subpoena sent to 102 Reiman

 1   Street, floor two?

 2              MR. WOODARD:  What's the date on this?

 3              THE WITNESS:  Yeah, if you're -- there's

 4   an event where an information subpoena was sent on May

 5   10th or at least created on May 10, 2011.

 6   BY MR. ANDREWS:

 7     Q.  Same date as this letter; correct?  Chiari 138?

 8     A.  Correct, the two would have been created at the

 9   same time.

10     Q.  And sent out together?

11     A.  No, not in the same -- no, not sent out

12   together.  So just to, again, to speed things up, it

13   appears that the information subpoena was returned to

14   my office on June 8, 2011 by the USPS unclaimed.

15     Q.  And then in response, you served a subpoena or

16   attempted to serve a subpoena on the debtor?

17     A.  Well, in response, it's not a response to the

18   post --

19     Q.  June 27, 2011, the letter to server to serve?

20     A.  What we did after receiving the unclaimed

21   envelope from the postal service, we issued a subpoena

22   to take depositions, subpoena duces tecum, and --

23     Q.  The debtor exam.

24     A.  And we sent that subpoena duces tecum out to a

25   process server by letter dated June 27, 2011.

1     Q.   And did that process server indicate that

2  service was successful?

3     A.   On -- no.

4     Q.   What did he indicate?

5     A.   Well, I'm looking at an entry from July 10,

6  2011 where the process server stated that the

7  defendant moved from the address at 102 Reiman Street,

8  floor two.  Well, it doesn't say he moved from 102

9  Reiman Street, floor two, but the address where we

10  sent the subpoena to, the debtor had moved out.

11     Q.   Just handed you a document that's bates Chiari

12  156.  Is that the affidavit that you were just

13  referring to?

14     A.   This is the affidavit of the process server

15  indicating that the judgment debtor had moved from 102

16  Reiman Street, floor two, and that the process server

17  was unable to serve the subpoena duces tecum.

18     Q.   So and the judgment was in May of '06?

19     A.   I don't know when the judgment was entered.  I

20  have no reason to doubt that, but I don't know when it

21  was entered.

22     Q.   Let's just make sure we've got the right --

23  yeah, May of '06.  Okay, so May of '06 judgment is

24  taken and now we're at July?

25     A.   Again, I just want to clarify.  I'm not saying

1    the judgment was entered in May of '06.  I'll accept

2    what you're saying for the purposes of this

3    deposition.  The judgment was entered I'm sure

4    sometime before we obtained the file.

5       Q.  I'm happy to show you, but if you want to, you

6    know, if you're going to accept --

7       A.  I don't know the relevance, but I'm saying I

8    can't just simply accept what you're telling me.  I

9    will accept for the purposes of the deposition that it

10   was May of '06 when the judgment was entered.

11      Q.  And now we're at July of 2011, and has there

12   been any monies collected on this account?

13      A.  Again, I don't know what would have been

14   collected prior to September 12, 2006.

15      Q.  From September of -- so September of '06 to...

16      A.  September 12th of 2006.

17      Q.  To July of 2011, any monies collected on the

18   account to date between that time period?

19      A.  No.

20      Q.  So it's fair to say you had a tough time

21   locating this guy?

22      A.  That is fair to say, correct.

23      Q.  Is it defendant's position as we sit here today

24   that my client, William J. Wagner, is the debtor?

25      A.  I don't know, can't answer that.

1    Q.   So you can't speak one way or another whether

2  my client, Mr. Wagner, owes the debt to MJ Peterson

3  that you're trying to collect?

4    A.   As I've answered, I cannot answer whether the

5  plaintiff is the judgment debtor in the action MJ

6  Peterson, LLC versus William J. Wagner, Junior.

7    Q.   Showing you a document that was previously

8  marked as an exhibit in plaintiff's deposition?

9    A.   It's Exhibit H.

10         MR. WOODARD:  Exhibit H from the

11  plaintiff's deposition, right, correct.

12  BY MR. ANDREWS:

13    Q.   Yeah, have you ever seen that document before

14  in preparation --

15    A.   I probably have seen the document before, but I

16  don't remember.

17    Q.   You didn't review it in preparation for today's

18  deposition?

19    A.   I did not review this document in preparation

20  for today's deposition.

21    Q.   Is that a transcript of a judgment?

22    A.   It appears to be a transcript of a judgment

23  issued from the city court of Buffalo.

24    Q.   And who is the judgment debtor?

25    A.   The judgment debtor is William J. Wagner,

 1   Junior.

 2        Q.   And what's the address?

 3        A.   378 Windermere Boulevard, Amherst, New York

 4   14226.

 5        Q.   Thank you.  So I'm going to ask you again, as

 6   we sit here today, my client, William J. Wagner, who

 7   never resided at 378 Windermere Boulevard, is he the

 8   judgment debtor?

 9             MR. WOODARD:   Form.

10             THE WITNESS:   I don't know where your

11   client resided, so my answer is going to be I don't

12   know.  It's the third time I've been asked.

13             MR. ANDREWS:   Don't you think it's

14   important to be able to identify who the proper debtor

15   is?

16             MR. WOODARD:   Form.

17             THE WITNESS:   You're arguing.

18             MR. WOODARD:   Form.

19   BY MR. ANDREWS:

20        Q.   I'm just saying as a policy of Chiari & Ilecki,

21   is it important to be able to identify?

22        A.   Who the judgment debtor is?

23        Q.   Yes.

24        A.   Yes.

25        Q.   And in this case, you can't make that

```
 1   determination; is that correct?
 2                MR. WOODARD:  Form.
 3                THE WITNESS:  I don't have a policy of
 4   identifying people that sue me.
 5   BY MR. ANDREWS:
 6      Q.  That's not what I asked.
 7      A.  Yes, it is what you asked.
 8      Q.  Your office was retained by MJ Peterson to
 9   collect a judgment against William J. Wagner, Junior;
10   correct?
11      A.  Goldstein, Bulan and Chiari was initially
12   retained and then they merged into Bulan, Chiari,
13   Horwitz and Ilecki.
14      Q.  Your office is handling the account; correct?
15      A.  Correct.
16      Q.  And is it important to be able to identify the
17   debtor and/or to satisfy that judgment?
18      A.  Yes, I've already answered that.
19      Q.  Okay.  Is there a procedure in place for
20   accounts with judgments to be able to collect on these
21   accounts?
22      A.  Yes.
23      Q.  What's that procedure?
24                MR. WOODARD:  Form.
25                THE WITNESS:  The procedure -- the
```

1   question I think is so overbroad I can't answer it.

2   BY MR. ANDREWS:

3      Q.   All right.  We're going to go step by step.  I

4   come to you.  I'm a client.  I've got a judgment I

5   want you to satisfy.  What's the first step?  I say

6   Bill, I need your help satisfying this judgment.

7      A.   The first step is to obtain information as to

8   the court, obtain copies of the judgment, obtain

9   identifying characteristics of the judgment debtor,

10  work out a fee agreement, explain the terms of any

11  reimbursement for disbursement, and I will tell you

12  what you're asking involves quite a bit of detail.  So

13  I may forget some steps, but you also have to ensure

14  that your client's legitimate, and if you work out

15  those issues, then a search is done as to the judgment

16  debtor.

17     Q.   Okay.  That's -- let's go from there.

18     A.   And again, it was a relatively open-ended

19  issue, but the search involves a review of whether it

20  be Lexis or Westlaw, which has information as to

21  addresses and some asset information.  It may require

22  also a review of other court documents or clerk's

23  office documents.  Usually, Westlaw or Lexis will give

24  me clues as to additional searches that would have to

25  be done.  If I choose to take on the case and I tell

1  the client what I think the prospects are of

2  collection and I work out the letter of engagement and

3  obtain the consent and file the consent, after opening

4  the file on our system, then -- and determining an

5  address based on my research, a credit report would

6  also be run, an employment search could be done.

7      Q.  Not always?

8      A.  Not always.  Sometimes even a credit report

9  can't be run, especially if you don't have a social

10  security number.

11      Q.  Do you once you've -- what you've explained as

12  far as doing the different searches and identify what

13  you think is a good address, do you send a dunning

14  letter or demand letter to that debtor?

15      A.  It's not a demand letter, no.

16      Q.  What do you send, correspondence?

17      A.  Yes.

18      Q.  And what's that correspondence?

19      A.  The correspondence consists of enclosing a copy

20  of the consent, a copy of the judgment, the balance

21  information, a notice as to the possibility of

22  additional interest or charges -- and I'm

23  generalizing, there are specifics -- the fair debt

24  language and the judgment debtor notice of CPLR 5222.

25          MR. ANDREWS:  Paul, I apologize, my turn

1    not to have a stapler.

2              Mr. Chiari, I just showed you a document.

3    Did you review that document prior to today's

4    deposition?

5              MR. WOODARD:  Just for the record, Chiari

6    1 to 3.

7              MR. ANDREWS:  Sorry.

8              THE WITNESS:  I suspect I saw the

9    document.  I did not review the document preparing for

10   today's deposition.

11   BY MR. ANDREWS:

12     Q.  Is that the letter that you just testified a

13   few moments ago that you would send out to the debtor,

14   is that the type of letter?

15     A.  You mean the initial letter after a file is

16   opened by me?

17     Q.  Yes.

18     A.  No.

19     Q.  When does that type of letter get sent?

20     A.  Well, this type of letter would be sent in a

21   lot of different circumstances.  One would be if --

22   and by the way, I'll reference this letter.  This is a

23   letter which basically encloses the 5222 notice and

24   does provide a judgment balance, and this letter would

25   be sent if we were to take some type of action,

1    whether it be a restraining notice or an income
2    execution as required, issue possibly a subpoena with
3    that restraining notice or it's a standard letter that
4    we send when we are trying to confirm an address.  If
5    we obtain a new address, we'll often send this letter.
6        Q.  Hoping that the person it's addressed to is
7    going to contact you?
8        A.  Actually, no.  I mean, just hoping we can
9    confirm the address is our primary reason for sending
10   the letter.
11       Q.  Absent the assumption of mailing, how would
12   you --
13       A.  You mean the presumption of mailing?
14       Q.  I'm sorry, yeah.  Thank you.
15           Absent that, if you don't expect the debtor to
16   or the person the letter's addressed to contact you,
17   how are you going to confirm that --
18       A.  I didn't say I don't expect the debtor to
19   contact us.  I said it's not the primary purpose of us
20   sending the letter.  In fact, we don't ask for a
21   debtor to contact us.
22       Q.  What's your -- what is your intention when you
23   send that letter to collect a debt?
24       A.  It's part of a process to collect a debt.
25       Q.  Okay, and you just previously testified that

1   you send that to confirm the address of the debtor?

2      A.   Primarily.

3      Q.   Primarily to confirm --

4      A.   Actually, I didn't state that because if I'm

5   intending on serving a restraining notice I have to

6   send a 5222 notice, so there are many reasons why I

7   would send this letter.  One of the reasons would be

8   to confirm an address.  If I have nothing else that

9   I'm doing on the account, this letter would often go

10  out to confirm an address.

11     Q.   And if it doesn't come back as undelivered,

12  then Chiari & Ilecki's policy is that's a good

13  address?

14              MR. WOODARD:   Form.

15              THE WITNESS:   I wouldn't say it's Chiari

16  and Ilecki's policy that it's a good address.  Based

17  on the Lexis search or credit report search, we

18  probably have a good reason to believe it's a good

19  address, and I would say in most cases I would believe

20  it's a good address, but I won't always be certain

21  it's a good address.  I'd have to look at each file.

22  If you're asking generally, I could say generally I

23  would presume it's a good address, but not always.

24  BY MR. ANDREWS:

25     Q.   Looking at that document, the February 2, 2015

```
 1   letter, it's addressed to William J. Wagner, Junior;
 2   correct?
 3       A.   Just to clarify, I'm showing February 9th.
 4       Q.   I'm sorry, February 9th.  Thank you.
 5       A.   So if you're asking me if the February 9, 2015
 6   letter, Chiari 0 or Chiari 1, a letter addressed
 7   William J. Wagner, Junior, 5419 Roberts Road, Hamburg,
 8   New York 14075.
 9       Q.   Does a William J. Wagner, Junior live at that
10   address?
11       A.   I don't know if William J. Wagner, Junior lives
12   at that address.
13       Q.   So you sent a letter with a restraining notice
14   to a William J. Wagner, Junior that you don't know if
15   he lives at that address; is that correct?
16             MR. WOODARD:  Object to form.
17             THE WITNESS:  First of all, I didn't send
18   a letter with a restraining notice.
19   BY MR. ANDREWS:
20       Q.   Did a restraining notice go out that day?
21       A.   I don't know.  I'm looking at a letter.
22   There's no restraining notice with this letter.
23       Q.   Well, let's look back to Chiari 165, and we
24   look at the event date of 2/9/2015?
25       A.   Okay.
```

1      Q.   And there's a letter to debtor and information

2    subpoena to debtor?

3      A.   Correct.

4      Q.   So you did send out an information subpoena on

5    February 9, 2015?

6      A.   First of all, I didn't send out an information

7    subpoena on February 9, 2015.  Our records reflect the

8    fact that an information subpoena was prepared on

9    February 9, 2015.

10     Q.   So it was prepared, but not sent?

11     A.   I'm not saying it wasn't sent.  I'm saying I

12   didn't do that.

13     Q.   I'm not -- you're not testifying as to Bill

14   Ilecki.  I'm saying the firm, right, as the 30(b)(6)

15   witness did -- did --

16     A.   Well, I can testify as a thirty -- listen, I'm

17   testifying still on my own personal knowledge.  I'm

18   reading the same thing you're reading.  An information

19   subpoena was prepared by Melissa Overbeck.  I believe

20   she would have signed the information subpoena

21   immediately after preparing and provide that document

22   to a legal assistant to mail.  There's documentary

23   proof of the mailing.

24     Q.   So it was sent out then?

25     A.   I believe it was sent out, correct.

1    Q.  Okay.  That February 9, 2015 letter, that

2  wasn't mistakenly sent to that address, was it?

3    A.  The -- if you're talking about the letter which

4  is Chiari 1, the address or the letter is addressed to

5  William J. Wagner, Junior, 5419 Roberts Road, Hamburg,

6  New York 14075, that was intentionally -- that

7  information is intentionally placed on this letter,

8  and the letter --

9    Q.  At that address?

10    A.  Correct, the name and address.

11    Q.  You intended to send that letter to the person

12  residing at that address?

13            MR. WOODARD:  Object to form.

14            THE WITNESS:  Melissa Overbeck would have

15  prepared this letter.

16  BY MR. ANDREWS:

17    Q.  But what I'm --

18    A.  There's no reason to believe she did not intend

19  to send the address -- send the letter to William J.

20  Wagner at the address provided on Chiari 1.

21    Q.  What I'm asking though is your intention was to

22  send that letter to whoever resided at that address?

23            MR. WOODARD:  Object to form.

24            THE WITNESS:  Yeah, because you're asking

25  the question incorrectly and I've answered it.  We

```
 1    intended -- I can testify that Melissa -- I'm going to
 2    presume Melissa mailed this letter, intended to mail
 3    the letter to William J. Wagner, Junior at 5419
 4    Roberts Road, Hamburg, New York 14075, but that's not
 5    the question you asked, so I can't answer the question
 6    you asked unless you clarify whether we intended to
 7    send the letter as addressed.  We didn't simply send
 8    the letter to anybody at that address.
 9    BY MR. ANDREWS:
10       Q.  You intended to send it as addressed?
11       A.  Correct.
12       Q.  At that point, is the firm's policy that this
13    individual at that address is the debtor; correct?
14       A.  Okay.
15            MR. WOODARD:  Form.
16            THE WITNESS:  Again, are you asking me if
17    at the time, February 9, 2015, the firm believed that
18    the judgment debtor was William J. Wagner, Junior
19    residing at the address listed on the letter, Chiari
20    1?  That is correct.
21            MR. ANDREWS:  So let's go back to Chiari
22    165, event date is February 9, 2015 and the notes
23    indicate that a William Wagner calls office.  He lives
24    at the Roberts Road address, claims not him.  He's not
25    a junior.  Claims this has been REC stuff for last
```

```
 1  six, seven years for D, presumably is debtor.  Gave me
 2  last couple numbers of social security, SS, hashtag,
 3  paren is sixteen.  Told him would note file and E-mail
 4  attorney, e-mailed MO, and I assume MO is Melissa
 5  Overbeck?
 6              THE WITNESS:  Correct.
 7              MR. WOODARD:  Just to clarify, I think
 8  that's the February 12th entry.
 9              THE WITNESS:  That is correct.  It is the
10  February 12, 2015 entry.  MO would be Melissa
11  Overbeck, but your question was whether MO relates to
12  Melissa Overbeck, and yes, MO does relate to Melissa
13  Overbeck.
14              (Whereupon, Exhibit Plaintiff's B, an
15  E-mail, was marked for identification.)
16  BY MR. ANDREWS:
17     Q.  You've been handed a document that's Chiari
18  159, Plaintiff's Exhibit B.  Have you ever seen this
19  document prior to today?
20     A.  I might have.
21     Q.  It's an E-mail from Karen Sandford.  She's a
22  paralegal at your office?
23     A.  She's a legal assistant.
24     Q.  To Melissa Overbeck, who is an attorney at your
25  office?
```

1      A.   Correct, Melissa Overbeck is an attorney at my

2  office.

3      Q.   And it's dated February 12, 2015, and I'm just

4  going to read what it states.  A William Wagner called

5  office who lives at the Roberts Road address, claims

6  it's not him.  Gave me last two numbers of his social

7  security and didn't match what we have.  Is that what

8  it states?

9      A.   Well, it actually says a William Wagner called

10  office who lives at the Roberts RD address, comma,

11  claims not him, period.  Gave me two numbers of his

12  SS.

13      Q.   Last, last, but...

14      A.   I'm -- I'm not reading anything that has -- oh,

15  last two numbers.  Gave me last two numbers of his SS

16  and the number sign and didn't match with what we

17  have, period.

18      Q.   So SS and hashtag, is that your understanding

19  that's social security?  That's short for social

20  security?

21      A.   I would have interpreted that as social

22  security number.

23      Q.   Got that cleared up.

24          Did Melissa contact you ever about this E-mail?

25              MR. WOODARD:  Are you asking --

```
 1              THE WITNESS:  I don't know about the
 2    E-mail.  I mean, it's -- if you're asking if she ever
 3    specifically contacted me about this E-mail, I don't
 4    know.  I don't remember.
 5    BY MR. ANDREWS:
 6        Q.  She wouldn't have e-mailed you?
 7        A.  Are you asking me whether she would have in
 8    usual course have e-mailed me?
 9        Q.  Strike that.  Is there a protocol for an -- is
10    she -- strike.
11              Is Melissa an associate?
12        A.  Correct, she's an associate.
13        Q.  Is there a protocol for an associate at Chiari
14    & Ilecki to follow when being notified from a legal
15    assistant that a person is disputing being the debtor?
16        A.  Yes.
17        Q.  What is that protocol?
18        A.  Melissa would or the attorney would attempt to
19    verify whether the information provided by the person
20    calling is correct and whether the address that we had
21    for a debtor is correct.
22        Q.  And looking at the activity log, is there
23    anything to indicate that that was done in this case?
24        A.  Yes.
25        Q.  Show me where that is on the activity log.
```

```
 1              MR. WOODARD:  You're talking just about
 2    after February 12, 2015?
 3    BY MR. ANDREWS:
 4       Q.  February 12th she gets an E-mail from Karen
 5    stating that a William Wagner called in who says he's
 6    not the debtor, and you just testified that the
 7    protocol is to verify this, so I'm asking for you to
 8    show me where on the activity log after 2012 (sic)
 9    Melissa or someone else from the firm did that
10    verification?
11       A.  On the activity log, it appears that the next
12    entry was June 5, 2015.  Actually, I have to -- no,
13    that is -- it's June 5, 2015.
14       Q.  So let's go back to the log.  You received a
15    call from Mr. Wagner on February 12, 2015, and then
16    you received a second call from Mr. Wagner on March
17    19, 2015; is that correct?
18       A.  According to this --
19       Q.  According to the activity log?
20       A.  -- Chiari 165, there was a telephone call on
21    March 19, 2015, not from the debtor though.  It was
22    from somebody who claimed he was not the debtor.  I
23    mean, that's what the notes say.  He is not debtor,
24    advise we e-mailed attorney, so William Wagner called.
25    The gentleman who called claims he is not the debtor.
```

     1      Q.  So two times your office receives a call from

     2   someone saying he's not the debtor, and the next

     3   action is a debtor exam is prepared and a letter sent

     4   to a process server to serve that person; is that

     5   correct?

     6                  MR. WOODARD:  Form.

     7                  THE WITNESS:  No, no, that actually is not

     8   correct.

     9                  MR. ANDREWS:  So what happened in between

    10   those two phone calls and the time that the subpoena

    11   was drafted and sent to the process server to be

    12   served?  Is there --

    13                  THE WITNESS:  Again --

    14                  MR. WOODARD:  Form.

    15                  THE WITNESS:  -- your question is

    16   presuming something that didn't happen.  So after the

    17   telephone call, and again, I'm referencing Chiari 165.

    18   After the telephone call, we received on May 11, 2015

    19   from the United States Postal Service a return of the

    20   information subpoena as unclaimed.  A subpoena was

    21   prepared by the paralegal to be given to the attorney.

    22   The paralegal can't sign the subpoena.  That subpoena

    23   didn't go out.  Melissa before sending the subpoena

    24   reviewed the file as she's required to do, ran a

    25   search of Lexis, and actually in this case I think she

 1   also -- she can testify to that, but she had told me

 2   she also checked at some point Real Info, which

 3   basically is a program that can find real property

 4   assessment information.  Melissa would have done the

 5   review to determine whether we had a good address for

 6   the judgment debtor.  She would have done that review

 7   on June 5, 2015.

 8   BY MR. ANDREWS:

 9      Q.  And that review indicates that LX, that stands

10   for Lexis?

11      A.  I -- yeah, I believe she -- that would have

12   been her initial for Lexis.

13      Q.  It says -- looks like WW, comma, SR, period, so

14   I assume that's William Wagner, Senior, and WW, comma,

15   JR, period, William Wagner, Junior, live at same

16   address.  Advised action to be sure to serve correct

17   DBTR, debtor?

18      A.  Yeah, that is the notation.

19      Q.  So what report did she rely on?  Did you

20   produce that reference report that she relied on?

21      A.  I don't know if that Lexis report was produced.

22   I doubt we could have produced a report from June 5,

23   2015.  We don't print or save the reports.  You may

24   have a report that would have had a date after June 5,

25   2015.  I do not know if it was produced.

1    Q.  Is that the report you're referring to?

2    A.  I have a report, Chiari 182.  It's a report

3  from Lexis dated December 31, 2015.

4              MR. WOODARD:  Chiari 182 to 191.

5              THE WITNESS:  Oh, I'm sorry.

6  BY MR. ANDREWS:

7    Q.  So you have this report.  You obviously printed

8  this.  It's not your procedure to print reports that

9  you used to determine the address of someone you're

10  going to serve a debtor exam on?

11    A.  We do not print.  It is my policy not to print

12  the Lexis reports.

13    Q.  But you printed this one?

14    A.  Generally.

15    Q.  You printed this one.  So why did you print

16  this one, the December 31st, and you didn't print the

17  one that Melissa...

18    A.  I think you -- this was printed in -- either in

19  response to your disclosure request or in anticipation

20  of litigation.

21    Q.  Going back to your prior testimony, when you

22  said there's a procedure in place to work accounts

23  that have judgment, is one of the actions undertaken

24  by the firm to send a subpoena duces tecum?

25    A.  That is one of the enforcement mechanisms that

 1   we employ when appropriate.

 2       Q.   And you send that to a debtor; correct?

 3       A.   A subpoena duces tecum can be sent to my

 4   debtor.  In my office, it's usually sent to a debtor.

 5   It can be usually sent to non-debtors as well.

 6       Q.   Non-debtors that --

 7       A.   Non-judgment debtors.

 8       Q.   In what regard would you send a subpoena duces

 9   tecum to a non-debtor?

10               MR. WOODARD:  Form, go ahead.

11               THE WITNESS:  Well, again, there's an

12   exhaustive list of cases, but probably the most common

13   circumstance when you might send a subpoena duces

14   tecum to a non-debtor is if you have an employer

15   that's not cooperating with an income execution that

16   you feel the person is employed and you want to get

17   some documentation as to payment history or some

18   information as to why they're not complying with an

19   income execution.  We used to send sometimes

20   information to a bank if you needed to see bank

21   records.  Mostly when you need to see documentation is

22   when it's really valuable as to non-debtors.

23   BY MR. ANDREWS:

24       Q.   So fair to say you've sent it to a third-party

25   when they have some connection to the debtor, usually

1  a financial connection?

2      A.  You have to, that's the law.  There has to be a

3  reason why you're sending a subpoena to a third-party.

4  You have to have a good faith belief that a

5  third-party has information.

6      Q.  Just so we're clear, if you're not sending it

7  to the debtor, the third-party has to have some kind

8  of connection to that debtor?

9      A.  You have to have a reasonable belief that there

10  is a reason why the third-party might have information

11  or documentation.

12              (Whereupon, Exhibit Plaintiff's C, a Real

13  Info print-out, was marked for identification.)

14  BY MR. ANDREWS:

15      Q.  So you've got a document that's been marked as

16  Plaintiff's Exhibit C, and it's based stamped Chiari

17  192?

18      A.  Okay.

19      Q.  And it's -- the top it says real-info.com.  Is

20  this the -- is this a copy of a snapshot of a website

21  that your firm utilizes to identify addresses of

22  debtors?

23      A.  Among other things, yes.

24      Q.  And you testified that Melissa used this Real

25  I'll refer to it as in order to identify the debtor's

1  address as 5419 Roberts Road; is that right?

2      A.   I think I testified that I believe Melissa did

3  run a Real Info or Real record search.

4      Q.   Is this the search to the best of your

5  knowledge that she ran?

6      A.   It wouldn't have been the search because the

7  date of this document is May 9, 2016, but just to make

8  things easy, the results probably would have been the

9  same.  You know what, I have to -- actually, I have to

10  take that back because I see there's a sale date,

11  4/23/15, so that sale may not have appeared on the

12  date that Melissa may have run her Real Info search.

13  Generally, the information would be the same; however,

14  in terms of the property description, the tax

15  information would have a different tax year that might

16  have a different assessed value.

17      Q.   The ownership would be the same, assuming it's

18  a refi; is that right?

19      A.   In this case, because of the fact it was a very

20  recent sale, I'm not sure that the 2015 transfer --

21  you can see there was a transfer in 2015.  I'm not

22  sure that would have shown up on the search run by

23  Melissa.

24      Q.   And this particular document doesn't reference

25  William J. Wagner, Junior at 5419 Roberts Road;

1    correct?

2        A.   Well, it references -- it speaks for itself.

3    It references a William Wagner at 5419 Roberts Road,

4    Hamburg, New York 14075.

5        Q.   But the debtor is William J. Wagner, Junior.

6    It's a different name; correct?

7                   MR. WOODARD:   Form.

8                   THE WITNESS:   No, it's not.

9                   MR. ANDREWS:   William Wagner and William

10   J. Wagner, Junior are not different names?

11                  MR. WOODARD:   Form.

12                  THE WITNESS:   They can be -- listen, they

13   can be the same name.   My name is William Ilecki.

14   It's also William J. Ilecki.   It's the same name.   I

15   mean, I answer to both.   If you're arguing that

16   William Wagner is identical in every respect to

17   William J. Wagner, Junior, of course not.   A J and a

18   junior are missing.

19   BY MR. ANDREWS:

20       Q.   I am going to show you a document that was

21   produced in response to plaintiff's discovery demands.

22   It's labeled Chiari 180 to 181.   It's a Trans Union

23   report.   Have you ever seen this particular report

24   before today?

25       A.   I probably have seen the report.   I don't

 1   remember specifically if I have received the report.

 2       Q.  If you look on page 181, was this report run on

 3   February 12, 2015?

 4       A.  The notation on the report is February 12, 2015

 5   at 11:30 -- I'm sorry, 10:11 a.m. central standard

 6   time I think.

 7       Q.  If we look back at Chiari 165, the activity

 8   log, does the pulling of this report, can you identify

 9   that occurred based on that activity log, the events

10   report?  The pulling of this report on 2/12/2015, can

11   you identify that on the events log?

12       A.  A credit report was ordered based on the events

13   log on February 9, 2015.

14       Q.  So is it fair to say this was the report that

15   corresponds with that?

16       A.  It is fair to say that this report would have

17   been created in response to the request on February 9,

18   2015.

19       Q.  Okay.  Did you review this report?

20       A.  I just said I'm not sure if I've ever looked at

21   it before, I probably have.

22       Q.  Can you tell based on the event log if an

23   attorney reviewed it?

24       A.  Yes.

25       Q.  Did an attorney review it?

1     A.   Yes.

2     Q.   What date did the attorney review it on?

3     A.   It appears June 5, 2015.  Now, is it possible

4  that an attorney could have reviewed it before June 5,

5  2015?  Just glance at it quickly, it's possible.

6     Q.   Do you know if Melissa reviewed this report

7  upon receiving the E-mail from Karen that Mr. Wagner

8  called in in dispute that he was the debtor?

9     A.   I don't know.

10     Q.   Looking at this report, does anywhere on this

11  report identify the Roberts Road address as an address

12  for William Wagner, Junior?

13     A.   No.

14               (Whereupon, Exhibit Plaintiff's D, a Trans

15  Union report, was marked for identification.)

16  BY MR. ANDREWS:

17     Q.   Looking at Chiari 165 again, the event log, the

18  March 19, 2015 entry, telephone call, William Wagner,

19  CO, dash, says he is not DBTR, debtor.  Says his DOB,

20  date of birth, is in ███████ 1950.  Dash, very

21  upset that he is getting LTRS, letters, from our

22  office.  Dash, ADV, advise him can send a copy of DL,

23  driver's license, and SS, pound, social security, if

24  he'd like.  Slash or dash, he says for us to just let

25  WI, I assume that's William Ilecki, know that he is

```
 1   not DBTR, debtor.  Dash, ADV, advise we did e-mail
 2   ATNY.  Is this -- did I read that right?
 3       A.  I would agree that the abbreviations, that
 4   you've correctly identified the language and the
 5   intention here.
 6       Q.  So and that was a -- Kristian; is that right?
 7       A.  Kristian.
 8       Q.  Yeah, Kristian, is that a legal assistant in
 9   your office?
10       A.  Correct.
11       Q.  Did you receive that E-mail from Kristian?
12       A.  This was not an E-mail.  This would -- this
13   isn't created as an E-mail.  It's actually an entry on
14   our database.
15       Q.  What I'm asking you is the note says advise we
16   did e-mail attorney.  Did you receive an E-mail from
17   him, like how Karen e-mailed --
18       A.  I know.  I know.  Your question was different
19   though, so if you're asking me did I receive an E-mail
20   from Kristian?
21       Q.  Yes.
22       A.  The answer is no, not in response to this
23   telephone call.  The answer is no.
24       Q.  Did you receive some communication from
25   Kristian in response to this telephone call?
```

```
 1      A.   I don't remember Kristian talking about the
 2   telephone call with me.  I mean, it is possible she
 3   talked to me about it, but I just don't remember it.
 4      Q.   So when she says advise we did e-mail, there
 5   was no E-mail; that's incorrect?
 6              MR. WOODARD:   Form.
 7              THE WITNESS:   No, your question is
 8   incorrect.   Your presumption is incorrect.
 9              MR. ANDREWS:   Does it read --
10              THE WITNESS:   Read it, Seth.   Advise we
11   did e-mail attorney.   We did.   Karen e-mailed the
12   attorney.
13              MR. WOODARD:   Plaintiff's B.
14   BY MR. ANDREWS:
15      Q.   Okay, so we e-mailed the attorney in the past
16   is what --
17      A.   We did.
18      Q.   Okay.   Okay.   That's what you're saying.   Okay.
19              MR. WOODARD:   Should we take a five-minute
20   break then?   Is now a good time?
21              THE WITNESS:   Do you need one?   I just
22   want to say I don't need a break.
23              MR. WOODARD:   Are we off?
24              (A discussion was held off the record.)
25   BY MR. ANDREWS:
```

1    Q.  Is there a procedure for when a person provides

2    identifiers, in this case some other social security

3    number, as well as their date of birth, with respect

4    to verifying if that's the debtor?

5    A.  Yes.

6    Q.  What's that procedure?

7    A.  Well, again, it's a very broad statement, but

8    the procedure involves an attorney receiving

9    notification and the attorney having to review whether

10   it be a credit report, a public record search, some of

11   the other search tools we have such as Real Info,

12   Lexis or Westlaw in making a determination whether we

13   need additional information or whether the information

14   provided by the person making the telephone call was

15   correct or not correct.

16   Q.  Is this policy in writing anywhere?

17   A.  No.

18   Q.  Was it a mistake to have the subpoena duces

19   tecum served on the Roberts Road address?

20           MR. WOODARD:  Form.

21           THE WITNESS:  I don't know.

22   BY MR. ANDREWS:

23   Q.  You don't know if it was a mistake?

24   A.  No, I don't know.

25   Q.  Was that subpoena sent to that process server

```
 1   with the intention to have the person residing at the
 2   Roberts Road address served?
 3              MR. WOODARD:  Object to form.
 4              THE WITNESS:  Again, again, yeah, I mean,
 5   your -- the form of your question is wrong.  I can
 6   answer, and then if you want to follow-up with a
 7   question, I'll provide you with testimony.  It was the
 8   intention of the firm, as I testified, to serve the
 9   judgment debtor at the address provided in the --
10   provided to the process server as long as the judgment
11   debtor resided, worked or -- at that address or that
12   address was the usual place of abode or dwelling
13   place.
14              MR. ANDREWS:  Did you make any error or
15   mistake at any point during your contacts with my
16   client, Mr. Wagner, with respect to attempting to
17   collect the judgment in favor of MJ Peterson, Inc.?
18              MR. WOODARD:  Object to form.
19              THE WITNESS:  Again, in terms of the
20   contacts that were made with your client, could you
21   please -- could you please specify which
22   communications you're referencing?
23              MR. ANDREWS:  The February 9th letter.
24              MR. WOODARD:  Object to form.
25              THE WITNESS:  Okay.  Here's -- okay, and I
```

1  understand the objection to form.  We didn't send the

2  February 9th letter to anyone other than the judgment

3  debtor.

4  BY MR. ANDREWS:

5     Q.  You sent it to William J. Wagner, Junior at

6  5419 Roberts Road, Hamburg, New York 14075; correct?

7     A.  Correct.

8     Q.  Who resides at 5419 Roberts Road, Hamburg, New

9  York 14075?

10             MR. WOODARD:  Form.

11             THE WITNESS:  I don't know.

12             MR. ANDREWS:  So it's possible you're

13  sending a collection letter to someone that's not the

14  debtor?

15             MR. WOODARD:  Form.

16             THE WITNESS:  No, that's not possible.

17  BY MR. ANDREWS:

18     Q.  That's not possible?

19     A.  No.  In this case, no.

20     Q.  So you alleged as an affirmative defense bona

21  fide error; correct?

22     A.  In the answer, there is an affirmative defense

23  of bona fide error.

24     Q.  What's the error?

25     A.  The error is as alleged by the plaintiff.  To

1  the extent the plaintiff is correct in the plaintiff's

2  allegation that there was a violation of the Fair Debt

3  Collection Practices Act, we have a bona fide error

4  defense as to that violation.

5     Q.  What is the error?

6     A.  I don't think there's an error right now.  I

7  haven't made the determination if there is an error

8  and I'm not the judge.

9     Q.  Is it defendant's position that William J.

10  Wagner, Junior, if he's not the debtor, by serving

11  that person with a debtor exam, is that an attempt to

12  collect a debt?

13           MR. WOODARD:  Object to form.

14           THE WITNESS:  In this one I've just lost

15  the question, and if you could repeat it?

16  BY MR. ANDREWS:

17     Q.  Sure, I'll try to clean it up a little bit.

18        Is it defendant's position that service of a

19  subpoena duces tecum, a debtor exam, is an attempt to

20  collect a debt?

21     A.  I would agree that if you're talking about

22  service of a subpoena in a -- in a post-judgment

23  enforcement proceeding.

24     Q.  Correct.

25     A.  That would be an attempt to collect a debt.

1    Q.  And that subpoena was served on William J.

2   Wagner; correct?

3              MR. WOODARD:  Form.

4              THE WITNESS:  I don't know.  I don't know.

5   BY MR. ANDREWS:

6    Q.  If we look at Chiari 166, on 6/24/2015 of the

7   event log, action, dash, dash, AOS, dash, dash, ST --

8   SDT, dash, dash, personal service, and that stands for

9   affidavit of service, subpoena duces tecum, personal

10  service, is that --

11   A.  I would agree that that would be the reference

12  in the abbreviation.

13   Q.  So I'm going to ask you again, was William J.

14  Wagner served with a subpoena duces tecum?

15              MR. WOODARD:  Form.

16              THE WITNESS:  I don't know.

17  BY MR. ANDREWS:

18   Q.  When you read that, what does that indicate to

19  you, someone was served?

20   A.  What this entry indicates to me is that there

21  was personal service of the subpoena duces tecum.

22   Q.  And where was -- do you know the address to

23  which that service was affected?

24   A.  I don't have the document in front of me, but

25  the affidavit would speak for itself as to the

1　address.

2　　Q.　Okay, fair enough.　Do you have the burden as

3　the debt collector, the attorney, to identify the

4　correct debtor or is the burden on the individual that

5　you're attempting to contact to identify themselves as

6　the debtor?

7　　　　　　MR. WOODARD:　Form.

8　　　　　　THE WITNESS:　Burden in what respect?　I

9　mean, burden is a term of art.

10　　　　　　MR. ANDREWS:　Burden not from a legal

11　standpoint, burden as it's your job in order to

12　satisfy the judgment to the best of your firm's

13　ability for your client?

14　　　　　　MR. WOODARD:　Form.

15　　　　　　THE WITNESS:　It's my job to attempt to

16　satisfy the judgment as legally permissible to the

17　best of my -- well, using reasonable means.

18　BY MR. ANDREWS:

19　　Q.　Does a person that you contact with respect to

20　attempting to collect the judgment have any obligation

21　or duty to provide you with information that you can

22　ascertain their identity?

23　　A.　Yes.

24　　Q.　A non-debtor, a non-debtor has a duty to you?

25　　　　　　MR. WOODARD:　Form.

1              THE WITNESS:  I don't think you asked
2    that.
3    BY MR. ANDREWS:
4      Q.  I'll clarify it as a non-debtor.
5      A.  A non-debtor can be required to provide
6    information to me by way -- absolutely, a non-debtor
7    can in some circumstances be required to provide
8    information to me.
9      Q.  So hypothetically speaking, my client, Mr.
10   Wagner, is not the debtor?
11     A.  Hypothetically speaking.
12     Q.  Hypothetically speaking, is he required then to
13   provide you information verifying that he is not the
14   debtor?
15              MR. WOODARD:  Form.
16              THE WITNESS:  If I subpoena your client,
17   that would be a requirement under the law.
18   BY MR. ANDREWS:
19     Q.  What about a phone call, is he required to give
20   you --
21     A.  There is no legal requirement for a non-debtor
22   to provide information identifying themselves as a
23   non-debtor during a telephone call with a
24   non-governmental agent.  You're talking about a legal
25   requirement and I want to stress that.

1    Q.  I just want to know if it's Chiari & Ilecki's

2    position as a policy, as a firm, that when they reach

3    out to consumers, to individuals that they believe is

4    a debtor, but they're not sure of, which is clearly in

5    this case based on your testimony --

6        A.  No, it's not my testimony.

7            MR. WOODARD:  Object to form.

8            THE WITNESS:  Absolutely, so ask it

9    differently.  I'm not going to answer that question.

10           MR. ANDREWS:  Is my client the debtor?

11           MR. WOODARD:  Object to form.

12           THE WITNESS:  I don't know.

13   BY MR. ANDREWS:

14       Q.  So you can't say today whether he's the debtor?

15       A.  I cannot.

16       Q.  So my question is this.  In this instance, you

17   don't know whether or not the person you've reached

18   out to via a letter, an attempted information subpoena

19   and a personal service of a debtor exam is the debtor;

20   correct?

21           MR. WOODARD:  Form, object to form.

22           THE WITNESS:  Actually, see, again, I've

23   already answered that, and really, I'm not trying to

24   be difficult.  You're missing the point.  We did reach

25   out to the debtor, to the judgment debtor.  Every

1    action we've taken is against the judgment debtor.

2    Whether the judgment debtor is your client, I can't

3    answer that.  That's the difference.  What's with the

4    smirks, Seth?

5    BY MR. ANDREWS:

6       Q.   Because it's -- you can't have it both ways,

7    Bill.  You can't have it both ways.

8       A.   You actually can.

9       Q.   I don't want to get into another argument

10   because it's not appropriate for this.

11          If a person fails to respond to a subpoena, is

12   it common for your office to proceed with an

13   enforcement motion?

14      A.   Yes.

15      Q.   And your office has --

16      A.   Properly served subpoena.

17      Q.   Yes, and your office has filed such motions in

18   the past?

19      A.   When appropriate, we have filed motions to

20   enforce a subpoena.

21      Q.   In fact, is it in your written procedures to do

22   such?

23              MR. WOODARD:  Form.

24              THE WITNESS:  It's not in my written -- if

25   you're talking about -- actually, I have to clarify.

1   I have a book that I've written, so it's in that.

2   BY MR. ANDREWS:

3       Q.   I've got the eight hundred pages of it right

4   here.

5       A.   Well, I don't know what you have right there,

6   but I have written on this issue, so that would be my

7   policy and procedure in writing on that issue.

8       Q.   So it's possible that if my client, Mr. Wagner,

9   didn't retain an attorney to assist him in not having

10  to proceed with attending a debtor exam based on being

11  served with a subpoena duces tecum, you would proceed

12  with an enforcement motion against him?

13      A.   Not necessarily, we would proceed against an

14  enforcement procedure against the judgment debtor.

15      Q.   Well, you served him.  You served someone at --

16  you served someone at the Roberts Road address;

17  correct?

18              MR. WOODARD:  Object to form.

19              THE WITNESS:  I'm presuming the -- as I

20  said, the affidavit speaks for itself, so if you're

21  saying the affidavit says we served someone with a

22  subpoena duces tecum at the Roberts Road address?

23  BY MR. ANDREWS:

24      Q.   Yes.

25      A.   Okay, you're dealing with that presumption?

1     Q.   Yes.

2     A.   Okay.

3     Q.   With that presumption, if there is a

4  non-response to that subpoena, you would proceed with

5  an endorsement motion; is that right?

6             MR. WOODARD:   Form.

7             THE WITNESS:   Again, I've answered that.

8  It depends on whether service was proper.   It also

9  depends on other things.   I mean, a judgment debtor

10  could file a bankruptcy, okay?   But we would not -- we

11  would only proceed in appropriate circumstances with

12  an enforcement proceeding.   That is our policy.

13  BY MR. ANDREWS:

14     Q.   Your policy is you wouldn't serve -- you would

15  not serve a debtor exam on an address that you didn't

16  believe the debtor resided at; correct?

17     A.   Okay, again, again, we would not serve a

18  subpoena except as provided by law.

19     Q.   What I'm asking is --

20     A.   I've answered.

21     Q.   No, you --

22     A.   If you want to go to another question, you can.

23     Q.   You didn't answer.   The question is you served

24  -- you served the subpoena on...

25     A.   Seth, you asked me if I would serve a subpoena

1   at an address.  There are many ways to serve a

2   subpoena.

3      Q.  What I'm asking you is, you're serving that

4   subpoena with the intention to serve the debtor;

5   correct?

6      A.  A judgment debtor.

7      Q.  Yes.

8      A.  In this case, a subpoena issued to a judgment

9   debtor, the intention is to lawfully serve the

10  judgment debtor.

11     Q.  Okay.  And you believed the debtor resided at

12  5419 Roberts Road; correct?

13     A.  I believe Melissa absolutely believed that that

14  is the address where the judgment debtor resided.

15     Q.  Despite two phone calls from Mr. Wagner saying

16  that he's not junior?

17     A.  Again, again, Melissa would have reviewed the

18  E-mail from Karen Sandford and would have reviewed the

19  events relative to the telephone calls as part of her

20  analysis of whether -- of what the address was for the

21  judgment debtor.

22     Q.  If we look back on Chiari 166 and we look at

23  the activity log event 629, the second, or I'm sorry,

24  was it maybe the first?  Yeah, no, maybe it is the

25  second, I apologize.  I think it's reviewed credit

```
 1   report, LX, which I think is Lexis.  DMV confirmed
 2   there's a William Wagner, W, slash, SS, pound, ending
 3   in 3918, comma, DOB, ████/50, living at Roberts RD,
 4   period, not our DBTR, not our debtor.  So seems that
 5   based on that notation, the firm's realized that the
 6   debtor doesn't reside at that address?
 7                   MR. WOODARD:  Form.
 8                   THE WITNESS:  That's absolutely incorrect.
 9                   MR. ANDREWS:  You think there's two
10   William Wagners living at that address?
11                   MR. WOODARD:  Form.
12                   THE WITNESS:  Well, you're asking what I
13   think.
14   BY MR. ANDREWS:
15      Q.  The firm, I want to know what the firm --
16      A.  But I believe there is a notation.
17      Q.  On page two looks it like WW, comma, SR,
18   period, and WW, comma, JR live at the same address.
19   So it's your position that there's two William Wagners
20   at this address?
21                   MR. WOODARD:  Form.
22                   THE WITNESS:  It's my position that
23   Melissa reviewed the file, and whatever other reports
24   she looked at and inputted the information, that she
25   believed it looks like WW, Senior and WW, Junior live
```

1   at same address.

2               MR. ANDREWS:  I'm all set.

3               MR. WOODARD:  Can give us just two

4   minutes?

5               MR. ANDREWS:  Yeah.

6               (A recess was taken.)

7               MR. WOODARD:  No questions from us.

8               ***12:10 p.m.***

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ERRATA SHEET

PAGE LINE

8  19
change: "CHASE" FOR CASE
reason: TYPO

8  20
change: "NOR" FOR OR
reason: TYPO

12  4
change: "REINGOLD" FOR "RYAN GOLD"
reason: TYPO

20  15
change: "2006" FOR 2016 - 2 PLACES
reason: TYPO

25  23,24
change: DELETE PERIOD AFTER ADDRESS
reason: REMAINDER UNINTELLIGIBLE

34  18
change: "POSTAL SERVICE FOR "POST"
reason: TYPO

change:
reason:

change:
reason:

change:
reason:

I WILLIAM ILECKI hereby certify
that I did review and if necessary correct this
deposition and that the foregoing pages 1 through
77 are a true and accurate recording of said
proceedings.
PER ERRATA CHANGES -

Subscribed and sworn to before me this
15 day of June , 20 17 .

Notary Public

MELISSA LYNN OVERBECK
Notary Public - State of New York
Qualified in Erie County
No. 02OV6266364
Commission Expires July 23, 2020

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

1 | STATE OF NEW YORK
COUNTY OF ERIE

2

3 |    I, Molly Fenske, a Notary Public in and for the
State of New York, do hereby certify:

4 |    That the witness whose testimony appears herein
before was, before the commencement of his deposition,

5 | duly sworn to testify to the truth, the whole truth
and nothing but the truth; that such testimony was

6 | taken pursuant to notice at the time and place herein
set forth; that said testimony was taken down in

7 | shorthand by me and thereafter under my supervision
transcribed into the English language, and I hereby

8 | certify the foregoing testimony is a full, true and
correct transcription of the shorthand notes so taken.

9

10 |    I further certify that I am neither counsel for
nor related to any parties to said action, nor in

11 | anywise interested in the outcome thereof.

12 |    IN WITNESS WHEREOF, I have hereunto subscribed my
name this 8th day of November, 2016.

13

14

15

16

17

18 |              Notary Public

19 |              State of New York

20

21

22

23

24

25