UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

WILLIAM J. WAGNER,

                    Plaintiff,                    **DECLARATION**

    -vs-                                     Docket No. 15-cv-633-FPG

CHIARI & ILECKI, LLP,

                    Defendant.

---

       WILLIAM ILECKI, ESQ., declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

       1.     I am an attorney at law duly licensed to practice my profession in the State of New York and a partner in – and principal of – the defendant, CHIARI & ILECKI, LLP, in this matter.   As such, I am familiar with the facts and circumstances involved in this litigation.

       2.     I submit this declaration in opposition to the plaintiff's motion for summary judgment and in support of Chiari & Ilecki's cross-motion for summary judgment.

       3.     The facts of this case are simple and largely undisputed.

       4.     Chiari & Ilecki was retained by M.J. Peterson LLC to collect a debt owed by a debtor named William J. Wagner, Jr.

       5.     One of Chiari & Ilecki's most experienced attorneys – Melissa Overbeck, Esq. – reviewed the information in our file and ran numerous searches

regarding the debtor, including ones on the LexisNexis public records database and the Real Info real estate database.

6.      Based on her research, Ms. Overbeck concluded that the debtor resided at 5419 Roberts Road, Hamburg, New York 14075.

7.      Therefore, in February 2015, our office mailed an information subpoena with restraining notice to the debtor at the Roberts Road address via certified mail, and, as required by law, we also mailed a CPLR § 5222 notice to him via first-class mail.

8.      Those were the only communications that our office personally sent to 5419 Roberts Road.

9.      Nevertheless, the plaintiff now seeks to hold us liable for violating the Federal Debt Collection Practices Act ("FDCPA").

10.     According to the plaintiff, his name is William J. Wagner, and he lives at 5419 Roberts Road.   He says that he is not a "Jr." and not the debtor, and that the debtor does not live with him.

11.     The plaintiff claims that as a result of our collection efforts, he suffered emotional distress.   In support of that claim, he has offered no medical records or expert testimony or, indeed, any proof at all aside from his own self-serving testimony.

12.     But even assuming that everything that the plaintiff claims is, in fact, true, he still cannot establish a violation of the FDCPA.

13.     The plaintiff asserts that Chiari & Ilecki has engaged in harassing, misleading, and unfair debt collection practices in violation of 15 U.S.C. §§ 1692d, 1692e, and 1692f, respectively.

14.     But both our information subpoena and CPLR § 5222 notice were specifically addressed to "William J. Wagner Jr." – the debtor – and the plaintiff himself has conceded that he knew that we were looking for someone else.

15.     Therefore, our communications were neither misleading under § 1692e nor unfair under § 1692f.

16.     Nor do they even approach the type of egregious behavior that is required to establish harassment under § 1692d.

17.     In fact, the plaintiff all but concedes that our February 2015 information subpoena and CPLR § 5222 notice are insufficient to establish an FDCPA violation.

18.     Rather, the plaintiff's chief complaint is that on June 17, 2015, a process server from Action Services & Research, Inc., handed him a subpoena duces tecum that our office had addressed to the debtor, after the plaintiff had called our office claiming that he was not the debtor.

19.     Specifically, after receiving our February 2015 correspondence, a man – apparently the plaintiff – called our office claiming that he was named William Wagner and lived at 5419 Roberts Road, but that he was not the debtor.

20.     We invited him to provide proof of his identity, but he refused to provide sufficient and complete information to allow us to verify his assertion. Therefore, we did not stop our collection efforts then and there.

21.    We did, however, conduct additional searches for the debtor's address and once again concluded that he lived at 5419 Roberts Road.

22.    Therefore, we prepared the June 2015 subpoena dues tecum and specifically addressed it to "William J. Wagner Jr." – the debtor.

23.    When we sent the subpoena to Action Services for service on the debtor, we specifically warned Action Services in writing – in fact, in bold-faced type – that there could be more than one William J. Wagner residing at 5419 Roberts Road – *i.e.*, both a "Sr." and a "Jr."

24.    We specifically instructed Action Services to serve only the debtor – William J. Wagner, Jr. – and not any other William J. Wagner residing at that address.

25.    Apparently, Action Services ultimately handed the subpoena to the plaintiff, but that does not subject Chiari & Ilecki to liability.

26.    Neither Action Services nor its individual process server who handed the subpoena to the plaintiff – John M. Celano – has ever been an agent or employee of Chiari & Ilecki.

27.    Action Services is a completely separate company with its own independent business.

28.    In terms of ownership and management, Action Services and Chiari & Ilecki are wholly unrelated.

29.    In both this case and a number of other cases, we have engaged Action Services to serve legal papers for us.   But we have no control over how Action Services accomplishes that work.

30.   Action Services has sole authority to decide what individual process servers to use when completing the assignments we give them – in this case, Mr. Celano.

31.   Action Services also furnishes all its own tools, supplies, and materials in completing our assignments.

32.   Action Services is not on Chiari & Ilecki's regular payroll.   Rather, we compensate Action Services on a per-assignment basis.

33.   Chiari & Ilecki is free to give Action Services – or any other process service company – as much or as little of our business as we wish, and Action Services is free to decline any assignment we give them.

34.   Thus, Chiari & Ilecki did not have the right to exercise – and did not exercise – control over the manner in which Action Services or Mr. Celano went about serving the subpoena duces tecum in this case.

35.   In other words, Action Services and Mr. Celano were independent contractors – rather than agents – of Chiari & Ilecki, and, thus, Chiari & Ilecki cannot be held vicariously liable for their actions.

36.   Moreover, the plaintiff's FDCPA claims concerning the June 2015 subpoena duces tecum also fail for the same reason as his claims concerning the February 2015 information subpoena and CPLR § 5222 notice.

37.   That is, the subpoena duces tecum was specifically addressed to "William J. Wagner Jr." – the debtor – and, again, the plaintiff himself has conceded that he knew that we were looking for someone else.

38.   Therefore, the subpoena duces tecum was neither misleading under § 1692e nor unfair under § 1692f.

39.   Nor do the plaintiff's allegations suggest that the process server engaged in anything close to the type of egregious misconduct that is required to establish harassment under § 1692d.

40.   For those reasons, Chiari & Ilecki has not violated the FDCPA.

41.   Furthermore, throughout the events at issue, our firm acted in good faith, followed our internal procedures, and exercised the utmost care and caution to locate and serve only the debtor and otherwise comply with the FDCPA.

42.   Therefore, even if we identified the wrong address for the debtor, the bona fide error defense immunizes us from any liability whatsoever.

43.   My firm and I focus much of our practice on representing creditors in collection cases.

44.   In fact, I personally have been handling collection cases for over twenty-seven years.

45.   Because my firm and I dedicate much of our practice to representing creditors, we ensure that we remain up to date on federal and state law relevant to our collections practice.

46.   I routinely review each and every newly published decision regarding the FDCPA – from federal courts all across the country – on a weekly basis.

47.   I regularly update Chiari & Ilecki's other attorneys and staff members regarding any pertinent developments in the case law usually on a weekly basis.

48.    Like all attorneys in good standing with the bar, my associates and I also attend CLE courses to keep up with developments in the law, especially on issues related to debt collection and the FDCPA.

49.    In fact, based on my knowledge and experience regarding collections law, I frequently am asked to lecture on this subject to other attorneys, as well as various creditor groups.

50.    I also have been asked to write articles or chapters on this subject in a number of legal publications.

51.    For instance, I authored the "Procedure" chapter in the New York State Bar Association's 2008 publication *Debt Collection and Judgment Enforcement*, which was published as part of the New York Lawyers' Practical Skills Series.

52.    Since 2010, I also have co-authored the "What Is a Debt Collection Case?" chapter and authored the "Enforcement of Money Judgment" chapter in the New York State Bar Association's publication *New York Lawyer's Deskbook, Second Edition*, including most recently the 2016-2017 version.

53.    In addition to keeping abreast of any developments in collections law, my firm and I have instituted a number of policies and procedures to ensure that we dutifully comply with the FDCPA and other federal and state collections law.

54.    All of our attorneys and staff members are trained in these procedures and FDCPA compliance generally – largely by me personally.

55.    Simply put, whenever we attempt to collect on a debt, we take great care to ensure that we have the correct address for the debtor.

56.    We certainly never dun or attempt to collect a debt from anyone but the debtor himself.

57.    Before we undertake collection efforts in any case, a trained attorney always performs skip tracing and reviews information relative to the debtor.

58.    When performing skip tracing and file review, we always begin by reviewing our file and then running various reports on the debtor.

59.    As noted above, I have been performing file review and skip tracing on a daily basis for over twenty-seven years.

60.    Through this wealth of experience, I have learned what sources are reliable and what sources are not.

61.    I have found reports from the Lexis and Westlaw public records databases to be the most reliable.   These reports include utility information, new moves, and some credit report information, which are the most reliably reported information available.

62.    I probably review around thirty such reports per day.

63.    We also obtain information from credit reports, the United States Postal Service, courts, and clerk's offices.

64.    When performing skip tracing, my associates and paralegals and I routinely use these reports and other programs that I have found to be reliable.

65.    My nearly thirty years of experience in collections also has taught me how to read search results together to connect the dots and identify the most likely address for a debtor.

66.    I have, in turn, passed on my experience to Ms. Overbeck and my other associates and paralegals, including by reviewing hundreds of files and reports with them.

67.    When more than one potential address for the debtor is identified, the attorney or paralegal compares reports and the information in our file and utilizes experience, common sense, and reasoned judgment to attempt to determine which address is most likely the correct one.

68.    If a paralegal or junior attorney performs initial skip tracing, either Ms. Overbeck or I personally double-check the paralegal's or attorney's research and analysis by separately conducting the same searches.

69.    Ms. Overbeck has worked for Chiari & Ilecki for almost nine years, and she has been an attorney here for nearly the last five of those years.

70.    Ms. Overbeck has gained significant experience in skip tracing in the nearly a decade that she has spent at Chiari & Ilecki, and she has demonstrated the type of reasoned judgment necessary to maximize the chances of locating the correct address for a debtor.

71.    Therefore, I have entrusted Ms. Overbeck with assisting me in reviewing the research and analysis of our other attorneys and paralegals.

72.    I also periodically review Ms. Overbeck's work, including her efforts to locate debtors.

73.    Either Ms. Overbeck or I always review the file before our firm undertakes any collection efforts, and we do not proceed until we feel confident that we have the right address for the debtor.

74.    In the event that an individual calls our office claiming that (1) we have directed collection efforts towards his residence, (2) he has a name similar to that of the debtor, and (3) the debtor does not reside with him, one of our FDCPA-trained legal assistants takes the call.

75.    The legal assistant who takes the call requests that the alleged non-debtor provide verifiable proof of his identity (*e.g.*, date of birth or Social Security number) and may request the individual's driver's license and Social Security card in order to confirm that he is not the debtor.

76.    The legal assistant who takes the call immediately inputs a summary of the conversation into the events log that we maintain for the debtor's file.

77.    If the attorney assigned to the file has not previously been made aware of the situation, the legal assistant is required to alert me or Ms. Overbeck regarding the caller's allegations.

78.    Additionally, the attorney checks the events log for developments in the case before undertaking any additional collection efforts.

79.    If the attorney concludes that the caller has provided verifiable proof that he is not the debtor and that the debtor does not reside at his address, we immediately stop collection efforts directed to the debtor at that address.

80.    In my experience, however, there are many instances where a debtor misrepresents his identity or address in communications with our office.

81.    Therefore, if a caller refuses to provide verifiable proof of his identity, the attorney performs additional skip tracing, including carefully reviewing the

information contained in our file and also running additional searches (such as on
Lexis or Westlaw) to confirm the debtor's address.

82.     Once again, Ms. Overbeck or I always review the file before any
additional collection efforts are undertaken.

83.     If we conclude that the debtor likely does not reside at the address at
issue, we immediately stop collection efforts directed to the debtor at that address.

84.     If, however, we still believe that the debtor resides at the address in
question, we may continue to undertake collection efforts against the debtor at that
address.

85.     In that case, we take steps to ensure that communications are directed
at only the debtor and not anyone else at that address.   We warn the staff, process
servers, or other third parties engaged to assist in collection efforts.

86.     Based upon my review of the file and my discussions with Ms.
Overbeck and our staff, I fully believe that our office procedures were properly
followed in this case.

87.     Before undertaking any collection efforts against the debtor – William
J. Wagner, Jr. – Ms. Overbeck reviewed our file and ran multiple reports, including
on Lexis and Real Info.

88.     Ms. Overbeck discovered that (1) the Lexis report for the debtor –
William J. Wagner, Jr. – listed 5419 Roberts Road, Hamburg, New York 14075, as
one of the top possible addresses for the debtor; (2) the Lexis report for the debtor
identified a Julia or Julie Wagner as a possible relative of the debtor; (3) the Real
Info report identified that 5419 Roberts Road was owned by a William Wagner and

Julie Wagner; and (4) our firm had previously ruled out the other top possible addresses that the Lexis report and older credit reports listed for the debtor.

89.     Therefore, Ms. Overbeck reasonably concluded that 5419 Roberts Road was the debtor's address and directed an information subpoena with restraining notice and the CPLR § 5222 notice required by law to the debtor at that address.

90.     When an individual (apparently, the plaintiff) called our office claiming that he had received our papers but was not the debtor, our office staff properly attempted to obtain verifiable proof of his identity, but the caller declined to provide anything more than the last two digits of his Social Security number and the month and year of his birth.

91.     Our staff properly memorialized those conversations in the events log for the debtor's file and notified Ms. Overbeck of the caller's allegations.

92.     Consistent with our office procedures, before undertaking any further collection activity, Ms. Overbeck conducted additional skip tracing (including on Lexis) to re-verify the debtor's address.

93.     Ms. Overbeck once again concluded that the debtor lived at 5419 Roberts Road and therefore prepared a subpoena duces tecum for Action Services to serve on the debtor at that address.

94.     As noted above, in her cover letter, Ms. Overbeck specifically warned Action Services that there could be more than one William J. Wagner at 5419 Roberts Road – *i.e.*, both a "Sr." and a "Jr." She specifically instructed Action Services to ensure that it served only the debtor and not any other William J. Wagner residing at 5419 Roberts Road.

95.     Our firm has worked with Action Services for many years, and we never have received complaints regarding their performance in the past.

96.     Thus, Ms. Overbeck had every reason to believe that Action Services would follow her instructions in this case.

97.     In sum, in seeking to collect the debt at issue, we consistently acted in good faith, followed our own procedures, and exercised the utmost care and caution.

98.     Therefore, even if we have violated the FDCPA – and we submit that we have not – the bona fide error defense shields us from liability.

99.     Plaintiff's counsel accuses Chiari & Ilecki of spoliation for not retaining copies of the Lexis and Real Info reports that Ms. Overbeck obtained concerning the debtor.  But to be clear, we had no expectation of being sued until we were served with the summons and complaint in this action, and, furthermore, Ms. Overbeck did *not* affirmatively destroy any Lexis or Real Info reports.

100.    Like most modern practitioners, my associates and I run searches on Lexis and Real Info online.   In other words, the Lexis and Real Info reports that Ms. Overbeck obtained were simply temporary files viewed in an internet browser.

101.    Our firm's policy is not to print out such reports because it is not practical, and there generally is no need to do so.

102.    When we perform skip tracing, we contemporaneously record our findings in the event log for the file, and if we ever want to view information from Lexis or Real Info again, it is as easy as logging back into our online account and running the search again.   The information in these reports is not lost over time; rather, the reports are merely updated and supplemented.

-13-

103.   Plaintiff's counsel notes that we *do* keep copies of TransUnion credit reports by contrast.   But the reasons for this disparate treatment are quite simple.

104.   Unlike Lexis and Real Info reports, we are *not* able to immediately access TransUnion credit reports.   Rather, with TransUnion, we place an order for a credit report, and the report is later delivered to us electronically in the format of a permanent, saved file.

105.   We also maintain copies of our TransUnion reports because our firm is billed for each individual search conducted.   In contrast, we have a flat monthly fee for Lexis and Real Info, so we can run as many searches as we want using those services without incurring any additional expenses to the firm.

106.   Finally, Lexis' terms of use require us to certify that we maintain any printed Lexis reports in either a lockable file cabinet or other restricted, secured area.   Given the incredibly high volume of Lexis searches that we run, printing and storing every single report in a file cabinet is simply impracticable.

107.   Indeed, that would require us to store tens of thousands of pages of search results every year.

108.   Plaintiff's counsel also notes that Chiari & Ilecki has been sued before for alleged FDCPA violations.   But that does not suggest that we fail to exercise due care in collecting debts.   To the contrary, our brief litigation history shows that our procedures clearly are effective, and we do comply with the FDCPA.

109.   Despite the high volume of collection cases that we handle, only three other FDCPA lawsuits have ever been filed against Chiari & Ilecki, and none of them involved a claim that we identified the wrong address for a debtor.

-14-

110.   Just as importantly, in every single one of those cases, Chiari & Ilecki has prevailed.

111.   In the first case, *Broughman v. Chiari & Ilecki, LLP*, the Hon. William M. Skretny granted Chiari & Ilecki's Rule 12(c) motion for judgment on the pleadings and dismissed the plaintiff's complaint, in its entirety, for failure to state a claim.   *See* W.D.N.Y. No. 12-cv-131, Doc. 16.

112.   In the second case, *Covell v. Chiari & Ilecki, LLP*, the plaintiff voluntarily dismissed the case, without receiving any settlement payment, after the plaintiff concluded that Chiari & Ilecki had not violated the FDCPA.   The stipulation of dismissal expressly stated:

> The reason the parties have agreed to this stipulation is that the plaintiff has determined that defendant Chiari & Ilecki, LLP, did not violate the Fair Debt Collection Practices Act.   Chiari & Ilecki, LLP, paid no moneys to the plaintiff in consideration of this stipulation or otherwise in connection with any settlement of any Fair Debt Collection Practices Act claim alleged by the plaintiff.

*See* W.D.N.Y. No. 12-cv-660, Doc. 42.

113.   In the third case, *Flower v. Chiari & Ilecki, LLP*, the Hon. E. Jeannette Ogden, J.S.C., granted Chiari & Ilecki summary judgment dismissing the complaint.   *See* N.Y. Sup. Ct., Erie County, No. 809945/2014, Doc. 49.

114.   Simply put, this case can fare no better.

115.   As set forth in the accompanying memorandum of law, the plaintiff's evidence – even if true – is insufficient to establish a violation of the FDCPA, and, in addition, the bona fide error defense immunizes Chiari & Ilecki from liability as a matter of law.

116.   Therefore, we respectfully request that this Court deny the plaintiff's motion for summary judgment and grant Chiari & Ilecki's cross-motion for summary judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   March ___, 2017

_____
William Ilecki, Esq.