# EXHIBIT J

# WILLIAM J. WAGNER vs. CHIARI & ILECKI, LLP.

## KAREN SANDFORD
### October 5, 2016



**Metschl**
AND ASSOCIATES
COURT REPORTERS • LEGAL VIDEO SERVICES

**Buffalo, NY**: 716 856-1906
**Rochester, NY**: 585 697-0969
**Toll Free**: 800 397-1796

*Min-U-Script® with Word Index*

```
 1  UNITED STATES DISTRICT COURT
 2  WESTERN DISTRICT OF NEW YORK
 3  _____
 4  WILLIAM J. WAGNER,
 5        Plaintiff,
 6
        vs              Docket No. 15-CV-633-JTC
 7
 8  CHIARI & ILECKI, LLP,
 9        Defendant.
10  _____
11  Examination Before Trial of KAREN SANDFORD, held
12  pursuant to the Federal Rules of Civil Procedure, in
13  the law offices of CONNORS LLP, 1000 Liberty Building,
14  424 Main Street, Buffalo, New York, on Wednesday,
15  October 5, 2016 at 2:07 p.m. before Molly Fenske,
16  Notary Public.
17
18
19
20
21
22
23
24
25
```

```
 1  APPEARANCES:

 2

    LAW OFFICES OF KENNETH HILLER, PLLC
 3  BY:   SETH J. ANDREWS, ESQ.
    6000 North Bailey Avenue, Suite 1A
 4  Amherst, New York  14226
    sandrews@kennethhiller.com
 5  Appearing for the Plaintiff.

 6

    CONNORS LLP
 7  BY:   PAUL A. WOODARD, ESQ.
    1000 Liberty Building
 8  424 Main Street
    Buffalo, New York  14202
 9  paw@connorsllp.com
    Appearing for the Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX TO WITNESS
 2
 3  KAREN SANDFORD                                     PAGE
 4
 5  Examination by Mr. Andrews....................5
 6
 7
 8
 9                      INDEX TO EXHIBITS
10
11                      None marked.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              (Whereupon, the following stipulations
 2   were entered into by the respective parties:
 3              It is hereby stipulated by and between
 4   counsel for the respective parties that the oath of
 5   the referee is waived, that filing and certification
 6   of the transcript are waived, and all objections,
 7   except as to the form of the question, are reserved
 8   until the time of trial.)
 9              THE REPORTER:  Mr. Andrews, you'll supply
10   Mr. Woodard?
11              MR. ANDREWS:  Yes.
12              THE REPORTER:  Read and sign in sixty
13   days?
14              MR. WOODARD:  Right.
15              KAREN SANDFORD, 58 Edgebrook Estates,
16   Apartment 4, Cheektowaga, New York 14227, having been
17   duly called and sworn, was examined and testified as
18   follows:
19              MR. ANDREWS:  Karen, hi.  My name is Seth
20   Andrews.  I'm the attorney for the plaintiff in this
21   matter, William J. Wagner.  He has filed a lawsuit in
22   federal court naming Chiari & Ilecki as defendants
23   alleging various violations of the Fair Debt
24   Collection Practices Act.  We're here today to take
25   your deposition as a fact witness as it pertains to
```

```
 1  some of the events that gave rise to this complaint,
 2  okay?
 3              THE WITNESS:  Okay.
 4              MR. ANDREWS:  I'm going to ask you some
 5  questions.  Do your best to provide me with responses.
 6  They have to be verbal.  They can't be uh-huhs or head
 7  nods, otherwise the court reporter can't take down an
 8  accurate account of what happened today.
 9              If you need to take a break at any time,
10  let me know.  We're going to be pretty quick though so
11  I don't anticipate it, but if something comes up, no
12  problem.  I just ask that if there's a question out
13  there, you answer the question prior to the break.
14              If at any time you don't understand, let
15  me know.  I'll try to rephrase.
16              If I'm speaking too fast, tell me to slow
17  down.  I do that a lot.  That's about it.
18              THE WITNESS:  Okay.
19  EXAMINATION BY MR. ANDREWS:
20     Q.  Any reason that you can't provide accurate and
21  truthful testimony today?
22     A.  Not at all.
23     Q.  Not on any medication that would impact your
24  ability to recall or provide accurate testimony?
25     A.  No.
```

```
 1     Q.   What's your date of birth?
 2     A.   ████████, 1971.
 3     Q.   And where were you born?
 4     A.   Olean, New York.
 5     Q.   Highest level of education you've obtained?
 6     A.   Associate's degree.
 7     Q.   Where did you get that degree from?
 8     A.   Erie Community College.
 9     Q.   And roughly when did you get that, do you
10  remember?
11     A.   1994.
12     Q.   In preparation for your deposition today, did
13  you discuss the case with anyone other than your
14  attorney or --
15     A.   No, no.
16     Q.   Did you review any documents at all in
17  preparation?
18     A.   No.
19     Q.   Never been arrested before?
20     A.   No.
21     Q.   Ever been convicted of any crimes?
22     A.   No.
23     Q.   Have you ever sued anyone before?
24     A.   No.
25     Q.   Ever been sued before?
```

```
 1      A.   No.
 2      Q.   Ever testified in court as a party?
 3      A.   No.
 4      Q.   Ever testified in court as a witness?
 5      A.   No.
 6      Q.   Good, quick.  How long have you worked for
 7  Chiari & Ilecki?
 8      A.   I've worked for Chiari & Ilecki for three
 9  years.
10      Q.   And when you first started, what was your
11  position?
12      A.   Legal assistant.
13      Q.   Is that your current position?
14      A.   Yes.
15      Q.   What does that entail?  What's your general job
16  duties?
17      A.   General job duties are take telephone calls,
18  process the mail that comes in, once in a while I'll
19  post payments to the accounts, I schedule motions.
20      Q.   Do you ever make any calls to debtors?
21      A.   No.
22      Q.   Do you receive incoming calls from debtors?
23      A.   Yes.
24      Q.   Do you recall if you were trained in Fair Debt
25  Collection Practices Act compliance?
```

```
 1      A.   Yes.
 2      Q.   Do you recall who trained you?
 3      A.   Well, I've been a legal -- I've been doing
 4   collections for twenty years, so my previous employer
 5   I was trained as well.
 6      Q.   Who was your previous employer?
 7      A.   Dugan, Somerstein and Hutter.
 8      Q.   How long did you work for them for?
 9      A.   I worked for them for approximately sixteen
10   years.
11      Q.   So between them and Chiari & Ilecki that makes
12   it twenty or am I missing a year in there?
13      A.   Approximately twenty, yes, that's correct.
14      Q.   When you came over to Chiari & Ilecki, I
15   understand that you had this background.  Did you get
16   any additional training in the FDC --
17      A.   I did take an online FDCPA certification
18   course.
19      Q.   That was offered through your employer, through
20   Chiari & Ilecki?
21      A.   Yes.
22      Q.   Is that mandatory or is that --
23      A.   Yes.
24      Q.   It wasn't just you just wanted to do it for the
25   sake of doing it?
```

1    A.  It was mandatory.
2    Q.  Do all legal assistants take it, do you know?
3    A.  Yes.
4    Q.  I assume you passed?
5    A.  Yes.
6    Q.  Do you have -- strike that.
7        Do you take any internal examinations from your
8  employer?  Do they provide you any internal testing to
9  make sure that you're up-to-date with compliance?
10   A.  I'm not sure what you mean by internal.
11   Q.  You said it was a third-party that you took a
12  test with; right?
13   A.  Right.
14   Q.  I'm just saying does Chiari & Ilecki say okay,
15  in a month we're going to give you our own exam, we
16  want to make sure that you're, you know, proceeding
17  with the current compliance that the law, you know,
18  allows for?
19   A.  Not an exam, but we do have monthly meetings
20  and weekly meetings.
21   Q.  Who are those meetings with?
22   A.  The monthly meetings are with the attorneys and
23  the other legal assistants and then the legal
24  assistants have a weekly meeting.
25   Q.  Do you know if you're ever provided any written

```
 1   material with respect to FDCPA compliance, you
 2   personally?
 3      A.  No.
 4      Q.  Never provided any kind of, like, training
 5   manual or compliance manual?
 6      A.  I believe one time it was a pamphlet through
 7   NARCA.  I might have that name wrong.  I might be
 8   wrong there.
 9      Q.  Are you generally involved in assisting
10   attorneys or working accounts that have judgments on
11   them?
12              MR. WOODARD:   Object to form.
13              MR. ANDREWS:   You can answer.
14              MR. WOODARD:   You can answer.
15              THE WITNESS:   Yes.
16   BY MR. ANDREWS:
17      Q.  Tell me a little bit about what your role is
18   with accounts.
19      A.  If there's a judgment?
20      Q.  Yeah.
21      A.  If someone calls the office and wants to set
22   up, like, a payment arrangement I'll help them with
23   that, and then the attorney approves or doesn't
24   approve it.
25      Q.  Any other activity you would work an account
```

```
 1  with a judgment that's regular for your job duties?
 2      A.  Well, if there's a motion to be scheduled, I
 3  will do that.
 4      Q.  Do you ever aid the attorneys in drafting any
 5  documents?
 6      A.  No.
 7      Q.  Here's a document I'm showing you that's been
 8  previously marked as Plaintiff's Exhibit A.  Have you
 9  ever seen that document before today?
10      A.  Yes.
11      Q.  When did you recall seeing it prior to today?
12      A.  When we met with Paul.
13      Q.  I don't want to know anything about what you
14  did with him, that's okay, as far as substance, you
15  know.
16          Other than meeting with your attorney, do you
17  recall ever seeing this document?
18      A.  No.
19      Q.  If we turn to the second page of the document,
20  165, and we look at the column -- it's on the front
21  page, but event done date and then there's description
22  and event comment.  It's basically the three far
23  right-most columns, and we look -- we see on February
24  12, 2015 there's a telephone call?
25      A.  Yes.
```

1   Q.  And you see your name listed on the far left
2   column?
3   A.  Yes.
4   Q.  And the comments section reads a William Wagner
5   calls office, comma.  He lives at the Roberts RD
6   address, comma.  Claims it's not him, comma.  He is
7   not a JR, period.  Claims this has been REC stuff for
8   last six, dash, seven YRS, four D, period.  Gave me
9   last couple numbers of SS, pound, open paren, sixteen,
10  closed paren.  Told him would note file and E-mail
11  ATYY, period.  E-mailed MO.  Is that right, is that...
12  A.  That's correct.
13  Q.  So MO, is that Melissa Overbeck?
14  A.  Yes.
15  Q.  That sixteen, is that -- what does that
16  signify, the last two of the social security number?
17  A.  Yes.
18  Q.  When you input that, those notes in, are you
19  able to see those later on?  Are you able to go back
20  and look at those notes?
21  A.  Yes.
22  Q.  Can you alter those notes?
23  A.  Yes.
24  Q.  When you e-mailed Melissa, showing you a
25  document that's previously been marked as Plaintiff's

```
 1   Exhibit B, is that the E-mail you recall sending her?
 2       A.   Yes.
 3       Q.   Did you ever hear back from her after you sent
 4   this E-mail to her?
 5       A.   No.
 6       Q.   She never talked to you about follow-up with
 7   Mr. Wagner?
 8       A.   No.
 9              MR. WOODARD:  Form.
10   BY MR. ANDREWS:
11       Q.   Do you know, is there a protocol that legal
12   assistants are supposed to follow when a person calls
13   in to dispute they're the debtor?
14       A.   Yes.
15       Q.   What's that protocol?
16       A.   We usually obtain the last four numbers.  We
17   ask for their last four numbers of their social and
18   their date of birth and also if they would be willing
19   to send us a copy of their driver's license and their
20   social security card.
21       Q.   And in this case, based on your notes, Mr.
22   Wagner provided the last two of his social security;
23   is that right?
24       A.   Yes.
25       Q.   Do you recall if he gave you his date of birth?
```

```
 1        A.   No, I don't believe I asked.
 2        Q.   Do you remember -- obviously I realize this is
 3   a year-and-a-half ago, so it's okay if you don't have
 4   the recall.  I don't want you to guess, but on the off
 5   chance that you did, do you have to, you know,
 6   anything stand out as far as his demeanor on that
 7   phone call, if you can recall?  Was he upset?  Did he
 8   seem irritated, agitated?  Was he calm?  Again, if you
 9   don't recall, I don't want you to guess.
10        A.   I don't remember.
11        Q.   That's fine.  It's a long time ago.  It's
12   understandable.
13             How many calls do you -- just on average do you
14   think you take per day?
15        A.   I would say between eight and ten.
16        Q.   So yeah, that's...
17        A.   Yeah.
18        Q.   Probably not -- unless it was something really
19   memorable, which means it was probably really bad.
20             That protocol you just described, do you know
21   if there's anything in writing that states what you
22   just told me as far as the firm policy, that protocol?
23        A.   That I don't know.
24        Q.   So you were never provided what you told me,
25   that protocol, in writing?
```

1     A.  No.
2     Q.  How did you come to learn of it?
3     A.  From the other legal assistants.
4     Q.  Just kind of passed down as you worked there?
5     A.  Yes.
6         MR. WOODARD:  Form.
7  BY MR. ANDREWS:
8     Q.  Is it policy to E-mail the attorney or was that
9  just something you just did on your own initiative
10 when there's a dispute with respect to a debtor's
11 identity?
12    A.  If the attorney is available, we'll call them.
13 If not, we E-mail them.
14    Q.  In every instance?
15    A.  Yes.
16    Q.  And then you kind of wash your hands with it,
17 unless you hear back from the attorney?
18    A.  Yes.
19    Q.  Does the attorney ever say I need you to do
20 some follow-up, call the potential debtor and get me
21 some more follow-up information?  Does that ever
22 happen?
23    A.  We don't call defendants.
24    Q.  Looking at that note -- strike that.
25        If you didn't look at that note and I asked you

```
 1  about a conversation on February 9, 2015 with a
 2  William J. Wagner, would you have any recollection?
 3     A.  No.
 4             MR. WOODARD:  When you say that note,
 5  you're talking about on the event sheet, Exhibit A?
 6             MR. ANDREWS:  Yes, yeah, yeah.
 7  BY MR. ANDREWS:
 8     Q.  So you have no independent recollection of that
 9  phone call absent looking at the note on the event
10  sheet?
11     A.  Right.
12     Q.  I think I asked this, I just want to
13  double-check.  You're not involved in any way in
14  drafting or preparing any correspondence or legal
15  forms the attorneys send out?
16     A.  Correct.
17     Q.  That's not part of your job duty?
18     A.  No.
19             MR. ANDREWS:  You're free to go.
20             MR. WOODARD:  No questions.
21             ***2:22 p.m.***
22
23
24
25
```

```
 1                    ERRATA SHEET
 2
 3      PAGE LINE
         9    7
 4      change: Dutin, Sommerstein & Hunter
           reason: misspelled
 5      ____ ____
        change: _____
 6         reason: _____
        ____ ____
 7      change: _____
           reason: _____
 8      ____ ____
        change: _____
 9         reason: _____
        ____ ____
10      change: _____
           reason: _____
11      ____ ____
        change: _____
12         reason: _____
        ____ ____
13      change: _____
           reason: _____
14      ____ ____
        change: _____
15         reason: _____
        ____ ____
16      change: _____
           reason: _____
17
18
        I  Karen Sandford                        hereby certify
19      that I did review and if necessary correct this
        deposition and that the foregoing pages  4.  through
20       16   are a true and accurate recording of said
        proceedings.
21                    Karen Sandford
        _____
22      Subscribed and sworn to before me this
        13  day of  December                 , 20 16 .
23            Patrick Donovan (signature)
24          Notary Public
25
```

PATRICK DONOVAN
NOTARY PUBLIC
STATE OF NEW YORK
LICENSED IN NIAGARA COUNTY
NO. 01DO6349216
MY COMM. EXP. 10/17/2020

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

STATE OF NEW YORK
COUNTY OF ERIE

   I, Molly Fenske, a Notary Public in and for the State of New York, do hereby certify:

   That the witness whose testimony appears herein before was, before the commencement of his deposition, duly sworn to testify to the truth, the whole truth and nothing but the truth; that such testimony was taken pursuant to notice at the time and place herein set forth; that said testimony was taken down in shorthand by me and thereafter under my supervision transcribed into the English language, and I hereby certify the foregoing testimony is a full, true and correct transcription of the shorthand notes so taken.

   I further certify that I am neither counsel for nor related to any parties to said action, nor in anywise interested in the outcome thereof.

   IN WITNESS WHEREOF, I have hereunto subscribed my name this 10th day of November, 2016.

*[Signature: Molly K. Fenske]*

Notary Public
State of New York