# EXHIBIT L

*WILLIAM J. WAGNER vs.*
*CHIARI & ILECKI, LLP.*

*ANTOINETTE FERRARO*
*October 5, 2016*



METSCHL
AND ASSOCIATES
COURT REPORTERS • LEGAL VIDEO SERVICES
**Buffalo, NY**: 716 856-1906
**Rochester, NY**: 585 697-0969
**Toll Free**: 800 397-1796

*Min-U-Script® with Word Index*

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NEW YORK

3  _____

4  WILLIAM J. WAGNER,

5         Plaintiff,

6         vs            Docket No. 15-CV-633-JTC

7

8  CHIARI & ILECKI, LLP,

9         Defendant.

10 _____

11 Examination Before Trial of ANTOINETTE FERRARO, held

12 pursuant to the Federal Rules of Civil Procedure, in

13 the law offices of CONNORS LLP, 1000 Liberty Building,

14 424 Main Street, Buffalo, New York, on Wednesday,

15 October 5, 2016 at 2:41 p.m. before Molly Fenske,

16 Notary Public.

17

18

19

20

21

22

23

24

25

```
1   APPEARANCES:

2
    LAW OFFICES OF KENNETH HILLER, PLLC
3   BY:   SETH J. ANDREWS, ESQ.
    6000 North Bailey Avenue, Suite 1A
4   Amherst, New York  14226
    sandrews@kennethhiller.com
5   Appearing for the Plaintiff.

6
    CONNORS LLP
7   BY:   PAUL A. WOODARD, ESQ.
    1000 Liberty Building
8   424 Main Street
    Buffalo, New York  14202
9   paw@connorsllp.com
    Appearing for the Defendant.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX TO WITNESS

 2

 3   ANTOINETTE FERRARO                              PAGE

 4

 5   Examination by Mr. Andrews....................5

 6

 7

 8

 9                     INDEX TO EXHIBITS

10

11   EXHIBIT                                         PAGE

12

13   Exhibit Plaintiff's G, May 15, 2015 letter.....16

14              Exhibit retained by counsel.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Whereupon, the following stipulations
 2       were entered into by the respective parties:
 3                    It is hereby stipulated by and between
 4       counsel for the respective parties that the oath of
 5       the referee is waived, that filing and certification
 6       of the transcript are waived, and all objections,
 7       except as to the form of the question, are reserved
 8       until the time of trial.)
 9                    THE REPORTER:  Mr. Andrews, you'll supply
10       Mr. Woodard?
11                    MR. ANDREWS:  Yes.
12                    THE REPORTER:  Read and sign in sixty
13       days?
14                    MR. WOODARD:  Sixty days.
15                    ANTOINETTE FERRARO, 1607 97th Street,
16       Niagara Falls, New York 14304, having been duly called
17       and sworn, was examined and testified as follows:
18                    MR. ANDREWS:  Antoinette, my name is Seth
19       Andrews.  I'm the attorney for the plaintiff, William
20       J. Wagner, in a lawsuit that he's filed naming Chiari
21       & Ilecki as a defendant alleging violations of the
22       Fair Debt Collection Practices Act.  We're here today
23       to take your testimony as a fact witness with respect
24       to certain circumstances that may have occurred
25       leading up to the complaint.
```

1              I'm going to ask you some questions.  Do

2     your best to respond.  If for some reason you don't

3     understand, let me know.  I'll try to rephrase.

4              If I'm talking too fast, let me know.

5     I'll try to slow down.

6              You've got to give me verbal responses.

7     You can't give head nods or uh-huhs because we have to

8     keep an accurate record.

9              If you need to take a break, I don't

10    anticipate it going very long so you probably won't

11    need to, but if something comes up, no problem.  I

12    just ask that if there's a question, you answer the

13    question before you have to step outside.

14              THE WITNESS:  Okay.

15    EXAMINATION BY MR. ANDREWS:

16       Q.  Any reason that you're aware of that you

17    wouldn't be able to provide truthful and accurate

18    testimony today?

19       A.  No.

20       Q.  Not on any kind of medication that would

21    prohibit accurate recall or providing accurate

22    testimony?

23       A.  No.

24       Q.  What's your date of birth?

25       A.  ██████████  1991.

1      Q.   And where were you born?

2      A.   Buffalo.

3      Q.   And what's the highest level of education you

4   obtained?

5      A.   I have my bachelor's degree.

6      Q.   Where did you get that from?

7      A.   Buffalo State College.

8      Q.   And when did you get that?

9      A.   Three years ago.

10     Q.   In preparation for your deposition today, did

11  you discuss the case with anyone other than Paul or

12  any attorney representing --

13     A.   No.

14     Q.   -- your firm?  Okay.

15          Have you ever been arrested before?

16     A.   I'm sorry?

17     Q.   Ever been arrested?

18     A.   No.

19     Q.   Ever been convicted of any crimes?

20     A.   No.

21     Q.   Ever sued anyone before?

22     A.   I have a lawsuit against somebody, yes.

23     Q.   I assume it doesn't relate in any way to debt

24  collection?

25     A.   It does.

1      Q.  It does, okay.  Where has that lawsuit been

2   filed?

3      A.  In Niagara County.

4      Q.  Have you ever testified in court as a party?

5      A.  No.

6      Q.  Have you ever testified in court as a witness?

7      A.  No.

8      Q.  Have you ever provided deposition testimony

9   prior to today?

10     A.  Unemployment hearing, I provided testimony.

11     Q.  Unemployment hearing for Chiari & Ilecki?

12     A.  Yes.  I was not the person filing unemployment,

13  I was just testifying.

14     Q.  Got you.  How long have you been at Chiari &

15  Ilecki for?

16     A.  Six years.

17     Q.  When you first started, what was your position?

18     A.  I started as a receptionist.

19     Q.  What's your current position?

20     A.  Paralegal.

21     Q.  And how long have you been a paralegal for?

22     A.  Four years.

23     Q.  Did you start working at Chiari & Ilecki after

24  you graduated Buff State or during?

25     A.  During.

1    Q.   Do you recall if you were ever trained in FDCPA

2    compliance at Chiari and Ilecki?

3    A.   Yes.

4    Q.   What was the process?

5    A.   It was an online course, like a certification

6    where it -- you, you know, they give you, like, a

7    video.  They give you -- they give you the statutes in

8    layman's terms and actual terms, and then you have to

9    take I think, like, it's an eighty-question quiz and

10   you have to score -- you have to get so many right in

11   order to get certified.

12   Q.   And you get certified?

13   A.   Yes, I've been certified for at least five

14   years.

15   Q.   Do you take this multiple times or do you just

16   take it once?

17   A.   Just once.

18   Q.   And you think you took it five years ago?

19   A.   Yes.

20   Q.   So when you first started working at Chiari &

21   Ilecki, that's when you took it?

22   A.   When I became a legal assistant after I moved

23   up from receptionist, yes.

24   Q.   Is there any internal training on FDCPA

25   compliance?

1      A.   Yes.

2      Q.   And what's that process?

3      A.   We meet once a month, the office does.

4      Q.   The entire office, attorneys --

5      A.   Yes.

6      Q.   -- legal assistants, paralegals?

7      A.   Yep, and we -- Bill reads case law once a week

8   to stay up-to-date with everything and he lets us know

9   if there has been any changes or any pending cases,

10   and we discuss how we should try to comply with those

11   or prevent -- for cases that are pending, prevent it

12   from becoming an issue ever.

13      Q.   Do you ever take any internal or oral written

14   exams?

15      A.   No.

16      Q.   Do you know if you've ever been provided any

17   kind of training manual or compliance manual with

18   respect to the FDCPA compliance from Chiari & Ilecki,

19   not from a third-party?

20      A.   No.

21      Q.   You've got it in front of you, perfect.   That

22   document in front of you has been labeled Plaintiff's

23   Exhibit A.   Have you seen that document prior to

24   today?

25      A.   Yes.

1    Q.  Other than when reviewing it with your
2   attorney, have you seen it?
3    A.  Not the paper form, no.
4    Q.  But you've -- oh, so you're familiar with the
5   electronic version of it?
6    A.  Correct.
7    Q.  Looking at 165, and if we go to 5/15/2015?
8    A.  Okay.
9    Q.  Your name to the far left?
10   A.  Yes.
11   Q.  And the far right, we see subpoena to take
12  deposition May 15, 2015?
13   A.  Correct.
14   Q.  Did you draft that subpoena or assist the
15  attorney in preparing it?
16   A.  I drafted it.
17   Q.  Just a merge doc?
18   A.  Yes.
19   Q.  Just tell me real briefly what that entails.
20  You draft it and then you provide it to the attorney
21  to review and sign?
22   A.  Correct.
23   Q.  I'm showing you a document that's been marked
24  Plaintiff's Exhibit F.  Have you seen that document
25  before?

 1     A.   Yes.

 2     Q.   What is that document?

 3     A.   The subpoena duces tecum that I prepared.

 4     Q.   If you look at the top, it says --  well, below

 5   the caption, re William J. Wagner, Junior, 5419

 6   Roberts Road, Hamburg, New York 14075?

 7     A.   Yes.

 8              MR. WOODARD:   I'm sorry, did you say 55 or

 9   5419?

10              MR. ANDREWS:   5419, did I say 55?

11              MR. WOODARD:   I may have misheard you.

12   BY MR. ANDREWS:

13     Q.   Does that address -- where did you get that

14   address from?

15     A.   It was in our system.

16     Q.   So identified as the address for the debtor?

17     A.   The debtor, yes.

18     Q.   Is that anywhere?  I can't see that based on

19   this action sheet, can I?

20     A.   Yes.

21     Q.   Where would I see that?  Show me.

22     A.   It's on page two.

23     Q.   Okay.

24     A.   And it looks like an event from 2/9 of '15

25   showing a Real Info search that shows that the debtor

```
 1   owns that address.

 2        Q.   So I guess my question though is did you input

 3   that address from just looking at that note or was

 4   there something else you looked at that showed that

 5   address linking to William J. Wagner, Junior?

 6        A.   No, it's in the system.   So this is a mergable

 7   document as we discussed, so it would just merge with

 8   that information in there.   The attorney, based on

 9   page two of Exhibit A, she would have input that

10   information.   So when I did the subpoena duces tecum,

11   it would have merged with that address on it.

12        Q.   So on some separate -- I guess strike that.

13        What I'm trying to figure out is when it looks

14   like Missy, Melissa, put the note in that debtor owns

15   5419 Roberts Road, when you go to merge, it's not

16   drawing it from this?   In other words, she had to

17   input that 5419 into some other software?

18        A.   Same software, it's just a different tab of the

19   software where you have the defendant's name, address,

20   date of birth, social, things like that.

21        Q.   And in other words, it's not pulling from here,

22   it's pulling from this different tab?

23        A.   Correct, this just shows where they get it

24   from.

25        Q.   Can you as a paralegal see that tab?
```

1      A.   Yes.

2      Q.   The information that you just testified to on

3  that tab, who was responsible for putting that

4  information that tab?

5      A.   From its origination, it would be whoever is

6  opening the file.  It could be the receptionist or a

7  legal assistant.  It's then given to myself to review

8  to verify.  I do Lexis, Westlaw searches, see if I

9  think they live somewhere else, and then I go, you

10 know, I'll prepare the summons and complaint, et

11 cetera.  If that's the route we're going, it goes to

12 an attorney to double-check my work, see if they agree

13 with the address I have, you know, decided, all of the

14 information that I have, you know, where to sue,

15 things like that, and then the attorney will sign it

16 if they think that it's sufficient and then they'll

17 send it out.

18     Q.   So either a paralegal or attorney can

19 ultimately put in that information in that other tab;

20 is that correct?

21     A.   A legal assistant can as well if they are given

22 -- if we verify addresses over the phone.  So if they

23 are given a different address than what we have,

24 they'll change it.

25     Q.   In this particular instance, you would just be

 1   speculating.  You don't know who would have put in

 2   that 5419 Roberts Road that you used as the merge

 3   document for the subpoena; right?  You can assume

 4   maybe it was Melissa because of the 2/9/15 entry, but

 5   there's nothing on this to tell you one hundred

 6   percent; is that fair?  I know that was a mouthful.

 7              MR. WOODARD:  Form.

 8              THE WITNESS:  No, it does -- knowing the

 9   system and how this is laid out, it does show that she

10   changed the address.

11   BY MR. ANDREWS:

12      Q.  Educate me.  How would I know looking at this

13   that that other tab of the address was added to?

14      A.  Where it says previous address 1571 Eggert

15   Road.

16      Q.  Yep.

17      A.  And then it says invalid address.  Then she did

18   a Lexis search and it shows that or the review credit

19   report, Lexis, DMV, it shows that basically says how

20   in some respect we found it.  So she utilizes --

21   utilized Real Info website and got that information.

22      Q.  Is it -- what I guess I want to ask, is it

23   possible to put in a note here that the address is

24   different, but not have it automatically updated in

25   this other tab section?

1   A.   No.   Where it says the previous address, that

2   automatically changes once you've changed it in the

3   other tab.   It automatically will create that previous

4   address.

5   Q.   Oh, okay.   So really, the second column is

6   telling you change they're having (sic) in this other

7   tab.   It's not really even corresponding with events

8   that are happening as it stated on this document; is

9   that right?

10              MR. WOODARD:   Form.

11  BY MR. ANDREWS:

12  Q.   Does that make sense?   Want me to rephrase?

13  A.   Yes, please.

14  Q.   So what you said I think is when it said on 2/9

15  of 2015 invalid address, that means to you that

16  Melissa on the other tab switched out the 1571 Eggert

17  Road for the 1519 Roberts?

18  A.   Correct.

19  Q.   So any time a change was made on that other tab

20  it's going to show in this second column, which if you

21  look at 164, page one of the events sheet is under

22  description; is that right?   The description column --

23  A.   Correct.

24  Q.   -- correlates with that other tab?

25  A.   Correct.

1      Q.  Okay.  Looking at that subpoena duces tecum,

2   page two, that's Melissa's signature.  She testified

3   to that.

4           MR. WOODARD:  We're talking about Exhibit

5   F again.

6   BY MR. ANDREWS:

7      Q.  Did you watch her sign it?

8      A.  No.

9      Q.  So you don't know if she reviewed it or not?

10           MR. WOODARD:  Form.

11           MR. ANDREWS:  This document, you weren't

12   in her presence when she signed it?

13           THE WITNESS:  Correct.

14           (Whereupon, Exhibit Plaintiff's G, a May

15   15, 2015 letter, was marked for identification.)

16   BY MR. ANDREWS:

17      Q.  You've been handed a document has been labeled

18   Plaintiff's Exhibit G.  It's a letter dated May 15,

19   2015.  Do you -- and it's stamped Chiari 17.  Do you

20   recognize this document?

21      A.  Yes.

22      Q.  Did you prepare this document?

23      A.  Yes.

24      Q.  Do you know if you sent out a signed copy?

25      A.  I usually sign them, so yes, but it was altered

 1   though.

 2       Q.   What was altered?

 3       A.   Where it's bold, the please be sure.

 4       Q.   Yep.

 5       A.   I did not put that in.

 6       Q.   So you just...

 7       A.   The rest of the form merges.

 8       Q.   So everything except for the please be sure to

 9   serve the correct William J. Wagner, period, we

10   believe there is a William J. Wagner, comma, Senior

11   and a William J. Wagner, Junior living at the same

12   address, that two sentences you did not put in there.

13   Everything else you're responsible for, you drafted?

14       A.   Correct, everything else merges.

15       Q.   Do you know who put that in there?

16       A.   Melissa.

17       Q.   Do you know that in any way based on review of

18   the events log?

19       A.   Yes.

20       Q.   What tells you that in the events log?

21       A.   On 6/5 of '15, it says that it looks like there

22   is a WW, Senior and WW, Junior living at the same

23   address.  Advised action to be sure to serve correct

24   debtor.

25       Q.   Do attorneys review letters before you send

1  them to the process server, typically?

2      A.  Quickly, yes.

3      Q.  So would this be out of the norm or not

4  ordinary that that phrase or an attorney strike that.

5          Is it not usual procedure for an attorney to

6  add something to a letter a legal assistant drafts

7  from a template or form to a process server?

8              MR. WOODARD:  Object to form.

9  BY MR. ANDREWS:

10     Q.  You can answer.

11     A.  Correct.

12     Q.  Other than preparing this May 15, 2015 letter,

13  which is Plaintiff's Exhibit -- I think is it G?

14     A.  Yes.

15     Q.  And the subpoena duces tecum, which is F, do

16  you have any other contact or did you do any other

17  work on this account?

18     A.  No.

19     Q.  Do you know if there's a procedure -- strike

20  that.

21          Do you ever take incoming calls from debtors?

22     A.  Yes.

23     Q.  Do you know if there's a procedure in place

24  with the firm in the event that a person calls in and

25  disputes that they're the debtor?  Do you know if

1   there's a procedure?

2       A.   Yes, there is.

3       Q.   What is that procedure?

4       A.   We ask them to verify their social security

5   number and their date of birth.  Typically, they're

6   not often comfortable with the whole social security

7   number, so we, you know, we'll let them know, you

8   know, last four of your social security is fine.

9           If it does not appear to match what we have, we

10  ask them to send in proof to verify that the

11  information they're giving us is correct, so typically

12  the driver's license or a copy of their social

13  security card and they can blackout everything but the

14  last four.

15          We also note the file, create an event that

16  states of our telephone call, you know, so so-and-so

17  called disputing that this is the person we're looking

18  for, verified, and we say how we verify it, and we'll

19  either -- if it's -- if they seem to be upset in any

20  way, we will E-mail the attorney.  Usually we just

21  E-mail the attorney anyways, but even if we do not the

22  event is in there, which usually raises a red flag for

23  any correspondence or anything to happen afterward for

24  the attorney to verify using Westlaw, Lexis, et

25  cetera, to see if they think they might have a

```
 1    different address.
 2        Q.   And what you just stated as far as that
 3    protocol, do you know if that's in writing anywhere on
 4    any, you know, manual or compliance, you know,
 5    correspondence to the firm that states what you just
 6    testified to?
 7        A.   I don't believe so, no.
 8        Q.   How did you learn of it?
 9        A.   I was trained by Bill Ilecki, and I do the
10    training at the firm of any new hire.
11        Q.   So any new hire, you --
12        A.   I train.
13        Q.   You train them?
14        A.   Yes.
15             MR. ANDREWS:   I'm all done.
16             MR. WOODARD:   No questions.
17             ***3:02 p.m.***
18
19
20
21
22
23
24
25
```

1                          ERRATA SHEET

2

3     PAGE LINE
      _____ _____
4     change:_____
          reason:_____
5     _____ _____
      change:_____
6         reason:_____

7     _____ _____
      change:_____
          reason:_____
8     _____ _____
      change:_____
9         reason:_____

10    _____ _____
      change:_____
          reason:_____
11    _____ _____
      change:_____
12        reason:_____

13    _____ _____
      change:_____
          reason:_____
14    _____ _____
      change:_____
15        reason:_____

16    _____ _____
      change:_____
          reason:_____
17

18
      I _____ hereby certify
19    that I did review and if necessary correct this
      deposition and that the foregoing pages _____ through
20    _____ are a true and accurate recording of said
      proceedings.
21        _____

22    Subscribed and sworn to before me this
      _____day of _____, 20_____.
23
      _____
24        Notary Public

25

1  STATE OF NEW YORK
   COUNTY OF ERIE
2
       I, Molly Fenske, a Notary Public in and for the
3  State of New York, do hereby certify:

4      That the witness whose testimony appears herein
   before was, before the commencement of his deposition,
5  duly sworn to testify to the truth, the whole truth
   and nothing but the truth; that such testimony was
6  taken pursuant to notice at the time and place herein
   set forth; that said testimony was taken down in
7  shorthand by me and thereafter under my supervision
   transcribed into the English language, and I hereby
8  certify the foregoing testimony is a full, true and
   correct transcription of the shorthand notes so taken.
9
       I further certify that I am neither counsel for
10 nor related to any parties to said action, nor in
   anywise interested in the outcome thereof.
11
       IN WITNESS WHEREOF, I have hereunto subscribed my
12 name this 11th day of November, 2016.

13

14

15

16                    *Molly K. Fenske*

17

18                 Notary Public
                   State of New York
19

20

21

22

23

24

25